**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

FREEDOM OF THE PRESS FOUNDATION
and KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA UNIVERSITY,

Plaintiffs,

v.

DEPARTMENT OF JUSTICE, NATIONAL
SECURITY AGENCY, CENTRAL
INTELLIGENCE AGENCY, and OFFICE OF
THE DIRECTOR OF NATIONAL
INTELLIGENCE,

Defendants.

No. 1:17-cv-9343-JGK

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Anna Diakun (AD-0327)
Leena Charlton (5622147)
Alex Abdo (AA-0527)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
anna.diakun@knightcolumbia.org
(646) 745-8500

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND ...................................................................................2

    I.      Surveillance of Members of the News Media.................................................2

    II.     The Request .....................................................................................3

    III.    Plaintiffs' Challenges ...........................................................................4

LEGAL STANDARD ...........................................................................................4

ARGUMENT .....................................................................................................5

    I.      DOJ-Crim improperly withheld information under the deliberative process privilege. ........................................................................................5

          A.    DOJ-Crim improperly withheld a slide from a training presentation. ............. 5

          B.    DOJ-Crim improperly withheld information from an official agency form........................................................................................... 7

    II.     The FBI improperly withheld information under Exemption 7(E).............................10

          A.    First Amendment and Media Leak Training Slides........................................ 11

          B.    Social Media Tools Slides ............................................................. 13

          C.    FBI Policy Guides...................................................................... 14

          D.    Documents Withheld Under Exemptions 1, 3, and 7(E) ............................... 16

    III.    The FBI's search for records was inadequate. ...........................................18

           A.    The FBI failed to establish that its search was adequate. ............................. 18

          B.    If the FBI relied on § 552(c) to exclude responsive records from its search, this was inappropriate. ....................................................... 20

              1.    Section 552(c) does not apply to Category 1(e) of the Request. ........ 20

              2.    If the FBI believes that the existence or nonexistence of records is a protected fact, it has improperly withheld that determination from Plaintiffs................................................ 22

    IV.    The Court should review the withheld documents *in camera*. ..................................24

CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*ACLU Found. v. DHS.*, 243 F. Supp. 3d 393 (S.D.N.Y 2017) ................................................. 11, 12

*ACLU Found. v. DOJ*, No. 19-cv-00290, 2019 WL 6117421 (N.D. Cal. 2019) ................... 11, 12

*ACLU of Mich. v. FBI*, 734 F.3d 460 (6th Cir. 2013) .................................................. 22

*ACLU of N.J. v. FBI*, 733 F.3d 526 (3d Cir. 2013) ..................................................... 22

*ACLU v. NSA*, No. 13-cv-09198, 2017 WL 1155910 (S.D.N.Y. Mar. 27, 2017) .......................... 7

*Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678 (2d Cir. 2010) ...................................................................................... 10, 11

*Am. Immigration Council v. DHS*, 905 F. Supp. 2d 206 (D.D.C. 2012) .................................. 5, 7

*Assadi v. USCIS*, No. 12-cv-1374, 2014 WL 4804785 (S.D.N.Y. Sept. 26, 2014) ..................... 14

*Blackwell v. FBI*, 646 F.3d 37 (D.C. Cir. 2011) ..................................................... 10

*Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184 (2d Cir. 2012) ....................................... 5, 6

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ................. 6, 7, 8, 9

*Coffey v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1 (D.D.C. 2017) ..................................... 17, 18

*Dep't of State v. Ray*, 502 U.S. 164 (1991) .......................................................... 4

*Doherty v. DOJ*, 775 F.2d 49 (2d Cir. 1985) .......................................................... 15

*Florez v. CIA*, 829 F.3d 178 (2d Cir. 2016) .......................................................... 21, 22

*Gelb v. Fed. Res. Bank of N.Y.*, No. 12-cv-04880, 2014 WL 4402205 (S.D.N.Y. 2014) ..................................................................................... 18

*Gen. Elec. Co. v. Johnson*, No. 00-cv-2855, 2006 WL 2616187 (D.D.C. Sept. 12, 2006) ...................................................................................... 7

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ......................................................... 4

*Knight First Amendment Inst. at Columbia Univ. v. DHS*, 407 F. Supp. 3d 311 (S.D.N.Y. 2019) .............................................................................. 10, 13

*Labow v. DOJ*, 831 F.3d 523 (D.C. Cir. 2016) ......................................................... 22

*Mobley v. CIA*, 924 F. Supp. 2d 24 (D.D.C. 2013) ..................................................... 19

*N.Y. Times Co. v. DOJ*, 756 F.3d 100 (2d Cir. 2014) ................................................................ 4, 16

*N.Y. Times Co. v. Secret Serv.*, No. 17-cv-1885, 2018 WL 722420 (S.D.N.Y. Feb. 5, 2018) ............................................................................................................... 11

*Nat'l Council of La Raza v. DOJ*, 411 F.3d 350 (2d Cir. 2005) ................................................... 4

*Nat'l Day Laborer Org. Network v. ICE*, 811 F. Supp. 2d 713 (S.D.N.Y. 2011) ........................ 7

*Nat'l Day Laborer Org. Network v. ICE*, 877 F. Supp. 2d 87 (S.D.N.Y. 2012) ................... 17, 18

*Nat'l Immigration Law Ctr. v. ICE,* No. 14-cv-9632, 2015 WL 12684437 (C.D. Cal. Dec. 11, 2015) ................................................................................................. 6

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ......................................................... 4

*PHE, Inc. v. DOJ*, 983 F.2d 248, 252 (D.C. Cir. 1993) ............................................................ 23

*Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865 (D.C. Cir. 2010) ...................... 6, 8

*Tigue v. DOJ*, 312 F.3d 70 (2d Cir. 2002) ........................................................................... 5, 7, 8

*Wilner v. NSA*, 592 F.3d 60 (2d Cir. 2009) .............................................................................. 21

*Wood v. FBI*, 432 F.3d 78 (2d Cir. 2005) .................................................................................. 4

**Statutes**

12 U.S.C. § 3414 ..................................................................................................................... 2, 16

18 U.S.C. § 2709 ..................................................................................................................... 2, 16

28 C.F.R. § 50.10 ............................................................................................................ 2, 8, 17, 18

5 U.S.C. § 552 ..................................................................................................................... passim

**Other Authorities**

132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) ................................................................... 23

Exec. Order No. 13,526 ............................................................................................................. 23

Justice Manual 9-13.400 .................................................................................................. 2, 8, 17, 18

News Release, DOJ, Attorney General Jeff Sessions Delivers Remarks at Briefing on Leaks of Classified Materials Threatening National Security (Aug. 4, 2017) .................... 2

## PRELIMINARY STATEMENT

This Freedom of Information Act ("FOIA") lawsuit seeks records concerning the restrictions imposed by statute, regulation, or the First Amendment on government surveillance targeting members of the news media. While Congress and certain agencies have imposed some safeguards to prevent the abuse of surveillance authorities to suppress protected speech and dissent, it is unclear how meaningful these restrictions are in practice.

To inform the public about the restrictions—or lack thereof—on government surveillance of members of the news media, Plaintiffs the Freedom of the Press Foundation and the Knight First Amendment Institute at Columbia University filed a FOIA request (the "Request") with the Department of Justice ("DOJ") and several other agencies seeking records relating to free-speech restrictions on surveillance authorities.

Since Plaintiffs filed suit to enforce their request, Defendants have released hundreds of pages of records, providing important insight into the government's policies and practices. However, two DOJ subcomponents—the Criminal Division ("DOJ-Crim") and the Federal Bureau of Investigation ("FBI")—have inappropriately withheld responsive records. As relevant to this cross-motion, DOJ-Crim has failed to justify its withholding of a training slide and part of an official form pursuant to Exemption 5, and the FBI has failed to justify its withholding of training slides, policy guides, and other documents under Exemptions 1, 3, and 7(E). The FBI has also failed to establish the adequacy of its search for records responsive to one category of Plaintiffs' request.

## FACTUAL BACKGROUND

**I.      Surveillance of Members of the News Media**

Various federal statutes authorize government searches, seizures, and other forms of surveillance that implicate core First Amendment freedoms. Cognizant of these implications, Congress has imposed statutory safeguards on some of these authorities to prevent agencies from initiating investigations or using certain investigatory tools "solely upon the basis of activities protected by the First Amendment." *See* 12 U.S.C. § 3414(a)(5)(A); 18 U.S.C. § 2709(b). Similarly, DOJ has adopted its own regulatory and policy constraints on the use of law enforcement investigative authorities to obtain information from members of the news media. 28 C.F.R. § 50.10 ("Media Guidelines" or "News Media Policy"); *see also* Justice Manual ("JM") 9-13.400, *available at* https://perma.cc/JC6W-29M9. But key parts of the agency's policies—such as how the agency interprets the term "member of the news media," as used in the Media Guidelines—are unknown. And these Guidelines do not apply to certain investigative tools, such as National Security Letters ("NSLs"), 18 U.S.C § 2709, calling into question how robust these protections are.

Recent reports of investigations into journalists, political dissenters, and others have only heightened concern about the adequacy of the existing limitations on government surveillance authority. In 2017, DOJ announced that active investigations into leaks of government information had tripled during the Trump administration, and that it would be "reviewing

policies affecting media subpoenas" to further loosen the constraints on surveillance of members of the news media.[1]

## II.      The Request

On October 10, 2017, Plaintiffs filed a FOIA request with several agencies, seeking all records concerning the restrictions imposed by statute, regulation, or the Constitution on government surveillance targeting members of the news media or otherwise implicating the freedoms of speech, association, or the press. ECF No. 1-1. After the agencies failed to produce responsive records, Plaintiffs filed this action on November 29, 2017 to enforce their Request. After negotiations, Plaintiffs narrowed the scope of their Request as memorialized in a Final Processing List. *See* Ex. A, ECF No. 26. Most relevant to this motion is Category 1(e), which sought "all requests or statistical information concerning requests for approval to issue NSLs for the acquisition of records or information of or about members of the news media." *See id.*

DOJ-Crim ultimately released 65 pages in full and 4 pages in part, withholding 229 pages in full. S*ee* ECF No. 48-2. It also withheld in full all records responsive to Category 1(e), instead producing a *Vaughn* index describing those records. The FBI released 506 pages in full or in part, s*ee* ECF Nos. 47-4, 47-5, 47-6, and stated that it "did not identify any records responsive to" Category 1(e). ECF No. 47-7.

---

[1] News Release, DOJ, Attorney General Jeff Sessions Delivers Remarks at Briefing on Leaks of Classified Materials Threatening National Security (Aug. 4, 2017), https://perma.cc/NQQ8-82F2.

III.     **Plaintiffs' Challenges**

Plaintiffs now challenge the withholding of two DOJ-Crim records and a handful of FBI records. Specifically, Plaintiffs challenge DOJ-Crim's withholding of (1) one PowerPoint slide and (2) a portion of a blank copy of an official form. Plaintiffs also challenge the FBI's withholding of information from (3) ten PowerPoint slides, (4) several sections of the Domestic Investigations Operations Guide ("DIOG") and the Counterintelligence Division Policy Directive and Policy Guide ("CDPG"), and (5) two documents entitled "Best Practices for Media Policy" and "National Security Letters." Finally, Plaintiffs challenge (6) the FBI's failure to produce records responsive to Category 1(e) of the Final Processing List. *See* ECF No. 49-2.

## LEGAL STANDARD

Congress enacted FOIA "to ensure an informed citizenry, vital to the functioning of a democratic society, needed . . . to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The government bears the burden of demonstrating that its searches were adequate and that any withheld documents or redactions fall within the claimed FOIA exemptions. 5 U.S.C. § 552(a)(4)(B); *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). The government's affidavits must give "reasonably detailed explanations," *N.Y. Times Co. v. DOJ*, 756 F.3d 100, 112 (2d Cir. 2014) (citations omitted), "without resort to conclusory and generalized allegations of exemptions," *Halpern v. FBI*, 181 F.3d 279, 290 (2d Cir. 1999).

The Court reviews the applicability of an exemption *de novo*, giving no deference to the agency's initial determination. *Wood v. FBI*, 432 F.3d 78, 82 (2d Cir. 2005). The exemptions must be construed narrowly, and doubts are resolved in favor of disclosure. *Id.* at 83.

## ARGUMENT

**I.      DOJ-Crim improperly withheld information under the deliberative process privilege.**

DOJ-Crim improperly invoked the deliberative process privilege under Exemption 5 to withhold information from two final agency records containing agency policy and instructions to staff. "An inter- or intra-agency document may be withheld pursuant to the deliberative process privilege if it is: (1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005) (citations omitted). "Predecisional" records may include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Tigue v. DOJ*, 312 F.3d 70, 80 (2d Cir. 2002) (citation omitted). Meanwhile, a document is "deliberative" if it "formed an essential link in a specified consultative process," "reflects the personal opinions of the writer rather than the policy of the agency," and "if released, would inaccurately reflect or prematurely disclose the views of the agency." *Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 202 (2d Cir. 2012) (citation omitted).

The withheld information—a training slide and part of a blank official form—are neither predecisional nor deliberative, and the purposes of the privilege would not be served by permitting DOJ-Crim to withhold them. Because the conclusory statements to the contrary in DOJ-Crim's declaration are not credible, FOIA requires the information's disclosure.

**A.      DOJ-Crim improperly withheld a slide from a training presentation.**

DOJ-Crim improperly withheld in full a slide from a February 2018 PowerPoint presentation titled "News Media Policy," which contains "various hypothetical situations involving requests for authorization pursuant to Section 50.10." Brodfuehrer Decl. ¶¶ 18, 20.

This slide appears to be used to train DOJ employees on the agency's News Media Policy. Brodfuehrer Decl. ¶ 20 (describing the slide as a "guidance document[]" "intended to assist DOJ attorneys in making well-formulated and properly supported requests for legal process pursuant to Section 50.10").

Training materials like this slide cannot be withheld under the deliberative process privilege because "[a] training is not a step in making a decision; it is a way to disseminate a decision already made." *See Am. Immigration Council v. DHS*, 905 F. Supp. 2d 206, 218 (D.D.C. 2012). Instead, this record is akin to those that FOIA requires to be affirmatively disclosed: "instructions to staff that affect a member of the public." *See* 5 U.S.C. § 552(a)(2); *Brennan Ctr.*, 697 F.3d at 195.

DOJ-Crim makes four main arguments in defense of its withholding, but none withstands scrutiny.

First, the agency claims that this slide falls within the privilege because it consists of "internal agency guidelines." Gov't Br. 10 (quoting Brodfuehrer Decl. ¶ 20). But this shows why the record cannot be withheld: "documents that merely reflect an agency's formal or informal guidelines or understanding of its own policies should be produced." *Nat'l Immigration Law Ctr. v. ICE*, No. 14-cv-9632, 2015 WL 12684437, at *9 (C.D. Cal. Dec. 11, 2015).

Second, DOJ-Crim asserts that this slide falls within the privilege because it "expresses the author's opinions and recommendations," rather than those of the agency. Brodfuehrer Decl. ¶ 20. This is unsubstantiated, nonsensical, and in direct conflict with its claim that the slide contains agency guidelines. A slide used to train agency employees reflects the views of the agency, rather than those of an individual. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). And the slide's instructions are not tentative or recommendatory in

nature: another slide in that same presentation warns that "[f]ailure to comply with policy may constitute grounds for reprimand or other discipline." *See* Declaration of Leena Charlton ("Charlton Decl."), Ex. 1.

Third, DOJ-Crim states that this slide relates to "interim steps" in the process for authorizing surveillance requests made pursuant to Section 50.10. Brodfuehrer Decl. ¶¶ 20–21. But "an agency's application of a policy to guide further decision-making does not render the policy itself predecisional." *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010). Instead, the record must relate to a "specific decision," which this generic training slide does not. *ACLU v. NSA*, No. 13-cv-09198, 2017 WL 1155910, at *13 (S.D.N.Y. Mar. 27, 2017) (training materials were not "related to a specific decision facing the agency," so deliberative process privilege did not apply); *see also Tigue*, 312 F.3d at 80 (citation omitted).

Finally, DOJ-Crim argues that this slide is deliberative and predecisional because it contains "hypothetical scenarios." Gov't Br. 10. But documents "constitut[ing] 'straightforward explanations' of an agency's pre-existing policy or regulations against the backdrop of specific or hypothetical factual situations, are not deliberative." *Gen. Elec. Co. v. Johnson*, No. 00-cv-2855, 2006 WL 2616187, at *5 (D.D.C. Sept. 12, 2006) (quoting *Coastal States*, 617 F.2d at 868); *Nat'l Day Laborer Org. Network v. ICE*, 811 F. Supp. 2d 713, 736 (S.D.N.Y. 2011).

Because the agency has failed to show that the privilege applies, the slide must be disclosed.

### B.   DOJ-Crim improperly withheld information from an official agency form.

DOJ-Crim also improperly withheld agency instructions from a blank copy of an official form. *See* Charlton Decl., Ex. 2. This "News Media Policy Consultation" form is used by DOJ employees during a mandatory consultation process pursuant to 28 C.F.R. § 50.10. *See*

Brodfuehrer Decl. ¶ 17. The form instructs DOJ employees to "provide relevant facts and analyze" certain issues if requesting a consultation "as to whether an individual or entity is a member of the news media." JM 9-13.400. DOJ-Crim, however, has redacted the instructions about what to analyze.

Such instructions to staff cannot be withheld under the deliberative process privilege. *See Coastal States*, 617 F.2d at 868; *cf.* 5 U.S.C. § 552(a). By explaining on a standardized form what issues to analyze, the agency "conveys existing policies instead of searching out new policies." *Am. Immigration Council*, 905 F. Supp. 2d at 219.

DOJ-Crim makes three primary arguments in defense of its withholding, each of which fails.

First, the DOJ-Crim declaration states that the withheld information contains only "recommendations" as to the facts DOJ attorneys should consider "when making their consultation requests." Brodfuehrer Decl. ¶ 20. But it is unclear how the redacted portion could contain "recommendations": the form instructs that "[t]he following information is *needed* in order for PSEU to draft a recommendation memorandum." *See* Ex. 2 (emphasis added). This information is required, not recommended.

But even if these were just "recommendations," they are those of the agency, not a particular individual. The deliberative process privilege protects recommendations that "contain subjective, personal thoughts on a subject," because public knowledge of such documents may "subject the writer either to ridicule or criticism" or "mislead the public." *Coastal States*, 617 F.2d at 869. But there is "nothing subjective or personal" about this form: it reflects the agency's considered judgment about what issues are relevant to the determination. *See id.* at 868; *Tigue*, 312 F.3d at 80 (citation omitted).

8

Second, DOJ-Crim asserts that the form is predecisional because "[i]t is preliminary to consultation requests submitted by DOJ attorneys to the Criminal Division." Brodfuehrer Decl. ¶ 20; Gov't Br. 11. But for the privilege to apply, the Second Circuit requires the agency to show that the record is "related to a *specific* decision facing the agency." *Tigue*, 312 F.3d at 80 (citation omitted) (emphasis added). This blank form is not related to any specific authorization decision facing DOJ-Crim, but was instead created to ensure that the News Media Policy is properly and consistently implemented. *See Pub. Citizen*, 598 F.3d at 875. Thus, though the mandatory form *predates* subsequent authorization requests, it is not *predecisional* as to those requests. *See Coastal States*, 617 F.2d at 868–69 (memoranda "routinely used by agency staff as guidance in conducting their audits" were not "'predecisional' simply because they play into an ongoing audit process").

Third, without explaining how, DOJ-Crim asserts that if this form were released, it "would result in public confusion or erroneous information about interim steps in the Section 50.10 authorization process" and "chill" discussion among employees. Brodfuehrer Decl. ¶ 21. These statements—along with the agency's other claims of harm—are unfounded. The agency has not said that the form contains erroneous information, so it is doubtful that releasing it would "result in public confusion." Especially given that "member of the news media" is not defined in DOJ's regulations, release of this information would lead to *less* confusion. Finally, disclosing a blank form could not possibly chill discussion about specific authorization requests since it involves no disclosure of details specific to those requests.

DOJ-Crim has failed to justify its withholding of official agency instructions, and the Court should reject its conclusory and unsubstantiated declaration.

## II.     The FBI improperly withheld information under Exemption 7(E).

The FBI has failed to justify its invocation of Exemption 7(E) in withholding information that appears to consist only of high-level training and policy documents. To rely on Exemption 7(E), an agency must first demonstrate that the record or information has been "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). It must then show that release of the withheld material "would disclose techniques and procedures for law enforcement investigations or prosecutions," or "guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).[2] For the reasons below, the withheld information is not the kind of law enforcement material the exemption is meant to protect.[3]

---

[2] Although this Court is bound by the Second Circuit's holding that the "qualifying phrase ('if such disclosure could reasonably be expected to risk circumvention of the law') modifies only 'guidelines' and not 'techniques and procedures,'" *Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 681–82 (2d Cir. 2010), Plaintiffs respectfully disagree and submit that the D.C. Circuit's interpretation, applying the qualifier to both phrases, is correct. *See, e.g.*, *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).

[3] To the extent that the FBI has relied upon Exemption 7(E) to withhold "sensitive file numbers," the names of or roles related to "[s]pecialized FBI units or squads," or email addresses and non-public web addresses, Seidel Decl. ¶¶ 25, 51; Gov't Br. 13, Plaintiffs do not challenge those redactions.

### A.      First Amendment and Media Leak Training Slides

The FBI has withheld portions of eight PowerPoint training slides, claiming that they contain "specific scenarios, hypothetical situations, and recommended responses, used to disseminate the FBI's 'playbook' of law enforcement strategies." Gov't Br. 14; *see* FBI 12, 34–35, 40, 905, 909, 1033–34 (Charlton Decl., Exs. 3–8, respectively). But given the nature of these slides, it is clear they do not fall within Exemption 7(E).

Most of these slides seem to contain First Amendment doctrine or other legal limits on investigative authority designed to teach employees how to abide by the law. Such "broad statements of law" "fall outside of the techniques, procedures, and guidelines subject to Exemption 7(E)." *Knight First Amendment Inst. at Columbia Univ. v. DHS*, 407 F. Supp. 3d 311, 332 (S.D.N.Y. 2019); *see* FBI 905 (titled "Free Speech"); FBI 909 (titled "Public vs. Gov't Collection of 1st Amendment Activity"), Exs. 6–7; *see also* FBI 12, 34–35, 1033–34, Exs. 3–4, 8. "[M]ere descriptions of codified law and policy"—even those containing "interpretation and application" of laws—"are not protected under Exemption 7(E)." *Knight*, 407 F. Supp. 3d at 333.

Other slides appear to describe issues and obstacles the FBI has previously faced. *See* FBI 40 (redacting "[e]xamples of recent activity"); FBI 1033 ("[redacted] Issues with Media Leak Cases"); 1034 ("[redacted] Obstacles"), Exs. 5, 8. The FBI's vague assertions about these records do not establish that they would disclose "techniques and procedures"—that is, "how law enforcement officials go about investigating a crime," *Lowenstein*, 626 F.3d at 682 (citation omitted)—much less "specialized, calculated" ones. *ACLU Found. v. DHS*, 243 F. Supp. 3d 393, 404 (S.D.N.Y 2017). *See* Gov't Br. 14. Nor do they appear to disclose forward-looking "guidelines," which relate "to resource allocation," *Lowenstein*, 626 F.3d at 682 (citation

11

omitted), and "cannot merely be a recitation of something that has already happened," *N.Y. Times Co. v. Secret Serv.*, No. 17-cv-1885, 2018 WL 722420, at *7 (S.D.N.Y. Feb. 5, 2018).[4]

The slides containing hypotheticals cannot be withheld for an additional reason: even if they contain general techniques rather than statements of the law, "Exemption 7(E) does not protect disclosures of an *application* of a known technique to particular facts, as distinguished from disclosure of an unknown law enforcement technique." *ACLU Found. v. DOJ*, No. 19-cv-00290, 2019 WL 6117421, at *9 (N.D. Cal. 2019). Moreover, similar "hypothetical" slides released in this case suggest that the redacted material is too general to be considered a "specialized, calculated technique or procedure." *See ACLU Found.*, 243 F. Supp. 3d at 404; FBI 193 (Charlton Decl., Ex. 9).

Citing *Poitras v. DHS*, the FBI argues that disclosing these slides would "'reveal sensitive strategic decisions made by the FBI,' including 'the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts,'" Gov't Br. 14 (quoting 303 F. Supp. 3d 136, 159 (D.D.C. 2018)), but these arguments are unfounded. Unlike the sensitive budgeting information in that case, here it is difficult to see how instructing staff on First Amendment limits could be a "sensitive strategic decision."

Nor do the FBI's claims of harm appear credible. For example, on one slide, the FBI redacted part of the following sentence: "[Redacted] are 1st Amend. protected speech, even though publicly available." FBI 905, Ex. 6. The withheld information is simply an assessment that a general category of information—likely information collected from social media websites,

---

[4] Even if some of this material is properly redacted, it is unclear why the agency needs to redact portions of the *titles* to protect that information. *See* FBI 1033–34, Ex. 8.

according to a similar slide[5]—is protected speech. *Id.* Disclosure would not reveal "valuable information on the FBI's capabilities and vulnerabilities," Seidel Decl. ¶ 52, or otherwise lead to circumvention of the law.

### B.   Social Media Tools Slides

The FBI has withheld information from two additional training slides, claiming that it redacted references "to certain 'cyber products' used as digital investigative tools." Gov't Br. 15; *see* FBI 903, 914 (Charlton Decl. Exs. 11–12). But these "digital investigative tools" appear primarily to refer to social media surveillance, a technique that may not be withheld because it is "well known." *ACLU Found.*, 2019 WL 6117421, at *10.

The first slide, titled "Overview," likely contains a brief summary of the "Privacy and Civil Liberties Training: Social Media Tools" presentation. *See* FBI 903, Ex. 11. But because social media surveillance is not a secret technique, *ACLU Found.*, 2019 WL 6117421, at *10, and because an "overview" slide is necessarily general, it is unlikely that the slide "truly embod[ies] a specialized, calculated technique or procedure" that is "not generally known to the public." *ACLU Found.*, 243 F. Supp. 3d at 402, 404 (citation omitted).

The second slide, titled "Mitigating Privacy & 1st Amendment Concerns," likely describes how the agency follows the law while carrying out its mandate. *See* FBI 914, Ex. 12. If it contains a "description[] of codified law and policy," *Knight*, 407 F. Supp. 3d at 333, those portions cannot be withheld under Exemption 7(E). Moreover, elsewhere in the FBI's production, there is a similar, less-redacted version of this slide. It states that "[t]here are no automated searches or collection of data on the system. All information is purged daily." *See* FBI

---

[5] *See* FBI 317 (Charlton Decl., Ex. 10).

269 (Charlton Decl., Ex. 13). At the very least, if this same information appears in this slide, it must be released.

### C.    FBI Policy Guides

The FBI improperly redacted sections of two policy guides: the Domestic Investigations Operations Guide ("DIOG") and the Counterintelligence Division Policy Directive and Policy Guide ("CDPG").[6] The relevant sections largely describe legal or administrative prerequisites to the FBI's use of an investigative technique. The FBI's declaration fails to support its Exemption 7(E) withholdings for three reasons.

First, the FBI's declaration is too vague to establish the FBI properly applied the privilege. *See Knight*, 407 F. Supp. 3d at 328 (requiring "reasonably detailed explanations" (citation omitted)). The FBI describes these documents as "procedures to be taken by law enforcement personnel in various circumstances." Gov't Br. 14. Providing little other context, the government argues that "[s]uch information falls squarely within the ambit of Exemption 7(E) law enforcement 'techniques and procedures.'" *Id.* For discrete sections, the FBI elaborates some: those passages refer to "specific law-enforcement techniques" and "prerequisites for their use." Gov't Br. 15; *see* FBI 1017; 1020, Ex. 16. These vague and conclusory descriptions

---

6 *See* DIOG §§ 16.9.3 (FBI 377–78), 18.5.6.4.8.1 (FBI 383–84), 18.5.6.4.8.2 (FBI 384), 18.6.6.3.3 (FBI 387), 18.6.6.3.4 (FBI 387–88), and 19.10.1 (FBI 394) (Charlton Decl., Ex. 14); DIOG App. G.12 (FBI 395–422) (Charlton Decl., Ex. 15); CDPG §§ 3.7.2 (FBI 1016–17); 3.7.3 (FBI 1017); 3.7.5 (FBI 1017–18); 3.7.6 (FBI 1018); 3.7.7 (FBI 1018–19); and 3.8 (FBI 1020) (Charlton Decl., Ex. 16). Plaintiffs no longer challenge the withholding of DIOG § 18.6.6.3.5 (FBI 388) or § 18.6.6.3.7.4 (FBI 389).

prevent meaningful review—especially because several sections are entirely redacted. *See* CDPG §§ 3.7.3, FBI 1017; 3.7.5, FBI 1017–18; 3.7.6, FBI 1018; 3.8, FBI 1020, Ex. 16. The Court should therefore order the FBI to disclose these records or, at the very least, to file supplemental declarations.

Second, many of the withheld sections describe preliminary approval processes, which are not techniques or procedures that fall within Exemption 7(E). This exemption protects only techniques and procedures "for law enforcement *investigations* or *prosecutions*," 5 U.S.C. § 552(b)(7)(E) (emphasis added), meaning those relating to the conduct of the investigation or prosecution itself. *See, e.g.*, *Assadi v. USCIS*, No. 12-cv-1374, 2014 WL 4804785, at *8 (S.D.N.Y. Sept. 26, 2014) (applying Exemption 7(E) to actual gathering of information).

These sections appear to be different in kind: they refer not to procedures used during actual investigations or prosecutions, but instead to the preliminary authorization process before employees can even initiate the investigatory technique. *See, e.g.*, DIOG § 18.5.6.4.8.1, FBI 383–84, Ex. 14 (approval requirements before conducting an interview); *see also* DIOG §§ 16.9.3, FBI 377–78; 18.5.6.4.8.2, FBI 384; 18.6.6.3.3, FBI 387; 19.10.1, FBI 394, Ex. 14; DIOG App'x G.12, FBI 395–422, Ex. 15; CDPG § 3.7.7, FBI 1018–19, Ex. 16. These approval processes are not techniques or procedures in the Exemption 7(E) sense, but mere legal or administrative antecedents, such as justifying the technique's use to a supervisor.[7]

---

[7] A leaked version of the 2011 DIOG confirms this. The corresponding leaked sections describe legal standards and approvals—for example, which office may sign off on the use of subterfuge in an interview—the disclosure of which would not compromise actual investigative techniques and procedures, or risk circumvention of the law. *See generally* Unredacted 2011

Third, in a few instances, the FBI has inappropriately relied on Exemption 7(E) to withhold publicly known legal standards. DIOG § 18.6.6.3.4, FBI 387–88, Ex. 14, is titled "Standards for Issuing NSLs." Although the FBI redacted this section, these standards are publicly available, codified in statutes, training materials, and elsewhere. *See, e.g.*, 18 U.S.C. § 2709(b)(1); 15 U.S.C. § 1681v; 18 U.S.C. § 3511; 12 U.S.C. § 3414(a)(5)(A); FBI 1066 (Charlton Decl., Ex. 18 ("National Security Letters")); "Termination Procedures for National Security Letter Nondisclosure Requirement" (Charlton Decl., Ex. 19).[8] Because the FBI cannot withhold under Exemption 7(E) information that is "generally publicly known," all public portions of section must be disclosed. *Doherty v. DOJ*, 775 F.2d 49, 52 n.4 (2d Cir. 1985).

Similarly, the withheld sections of the CDPG appear to interpret the FBI's obligations under the DOJ Media Guidelines, 28 C.F.R. § 50.10. *See* FBI 1016–20, Ex. 16. To the extent that the CDPG contains publicly known information embodied in the regulations or the Justice Manual, JM 9-13.400, they must be disclosed.

### D.      Documents Withheld Under Exemptions 1, 3, and 7(E)

The FBI has withheld information from two documents on the basis of Exemptions 1 and 3, as well as Exemption 7(E). *See* FBI 1052–54 (Charlton Decl., Ex. 21); 1066–67, Ex. 18; *see*

---

DIOG §§ 16.9.3; 18.5.6.4.8.1; 18.5.6.4.8.2; 18.6.6.3.3; 19.10.1; DIOG App'x G.12 (Charlton Decl., Ex. 17).

[8] As above, the leaked version of the 2011 DIOG confirms that much of the information redacted from this section is publicly available through official sources. *See* Unredacted 2011 DIOG § 18.6.6.3.4, Ex. 20.

*also* Gov't Br. 7–10, 14–15. But because it appears that at least some of the redacted information has been officially acknowledged, that information cannot be withheld.

Under Exemption 1, an agency may withhold information that has been classified pursuant to an Executive Order. *See* 5 U.S.C. § 552(b)(1). Under Exemption 3, an agency may withhold records that are "specifically exempted from disclosure by [a] statute" other than FOIA. *See* 5 U.S.C. § 552(b)(3). Even if these exemptions would otherwise apply, the government cannot withhold information that it has "officially acknowledged": information that is "as specific as" and "matches the information previously disclosed," and that was "made public through an official and documented disclosure." *N.Y. Times Co.*, 756 F.3d at 113, 120 & n.19.

The first document, titled "Best Practices for Media Policy," interprets the FBI's obligations under the DOJ Media Policy. *See* FBI 1052–54, Ex. 21. Although this policy is detailed at length in the agency's regulations, 28 C.F.R. § 50.10, and in the Justice Manual, JM 9-13.400, little of that information appears in the unredacted portions of the Best Practices guide. If the FBI has redacted any officially acknowledged information about the DOJ Media Policy, it must be released.

The second document is titled "National Security Letters." *See* FBI 1066–67, Ex. 18. As described above, a significant amount of information relating to the standards for issuing NSLs is publicly available through official sources. *See supra* Section II.C. To the extent that the withheld information has been officially acknowledged, it must be disclosed. Additionally, for those sections withheld solely under Exemption 7(E), much of this information appears to relate to preliminary approval requests, *see* FBI 1066, Ex. 18, which does not fall within the exemption.

**III.     The FBI's search for records was inadequate.**

The FBI's internal guidelines have long provided for its use of NSLs to obtain the records of members of the news media. *See, e.g.*, Appendix G.12 at 166, Officially Released 2011 DIOG, *available at* https://perma.cc/9UPJ-HNLJ. Given this, Plaintiffs sought through Category 1(e) "all requests . . . for approval to issue NSLs for the acquisition of records or information of or about members of the news media." *See* Ex. A, ECF No. 26. The FBI's failure to locate a single such request has only two possible explanations: either the agency failed to conduct an adequate search, or it is inappropriately invoking one of FOIA's so-called "exclusions" to refuse to acknowledge the existence of responsive records.[9]

**A.     The FBI failed to establish that its search was adequate.**

The FBI bears the burden to "show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Nat'l Day Laborer Org. Network v. ICE*, 877 F. Supp. 2d 87, 95 (S.D.N.Y. 2012) (citation omitted). It has failed to demonstrate that its search was adequate for three reasons.

First, the FBI has not established that it "searched all custodians who were reasonably likely to possess responsive documents." *Id.* It asserts that the search was adequate because one "NSL Subject Matter Expert" provided a list of individuals "who would have likely possessed or

---

[9] Based on the FBI's sworn statement that "the FBI does not track the specific category of NSL requests sought by Plaintiffs," Seidel Decl. ¶ 19, Plaintiffs no longer challenge the adequacy of the FBI's search for "statistical information concerning requests for approval to issue NSLs for the acquisition of records or information of or about members of the news media." *See* Ex. A, ECF No. 26.

been aware of responsive records." Seidel Decl. ¶ 19. But an agency cannot simply assert that all relevant custodians' records were searched; it must *establish* that they were. *See Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 95. This includes explaining "the names of any custodians that were searched" so that the Court can determine the adequacy of the search for itself. *See Coffey v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1, 11 (D.D.C. 2017). This failure is particularly striking because although Plaintiffs provided the FBI with a list of potential custodians drawn from its own rules, *see* Ex. A, ECF No. 26 at 6; DIOG § 18.6.6.3.3, FBI 387, Ex. 14 (listing officials with authority to sign NSLs), the FBI has not explained whether they "are likely to have responsive material, and, if so, whether there is any practical obstacle to searching for those materials," *Coffey*, 277 F. Supp. 3d at 11.

Second, although "an agency affidavit or declaration must describe in reasonable detail the scope of the search and the search terms or methods employed," *Gelb v. Fed. Res. Bank of N.Y.*, No. 12-cv-04880, 2014 WL 4402205, at *4 (S.D.N.Y. 2014), the FBI's declaration fails to give any detail about how it conducted the search, like the systems or files searched or the search terms used. The declaration only explains that the FBI identified "a point-of-contact within the FBI"; the point-of-contact "was unable to identify any responsive records"; and the other individuals identified by the point-of-contact "were likewise unable to identify any responsive records." Seidel Decl. ¶ 19. Because the FBI cannot carry its burden through such conclusory statements, the declaration "lacks sufficient detail to allow a court to conclude that the search was adequate." *Gelb*, 2014 WL 4402205, at *4.

Third, "[e]vidence that relevant records have not been released" suggests that the search was inadequate. *See Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 96 (citation omitted). Since at least 2011, the DIOG has contained rules about when and how the FBI may issue an

NSL for records of a member of the news media. *See, e.g.*, Appendix G.12 at 166, Officially

Released 2011 DIOG, *available at* https://perma.cc/9UPJ-HNLJ. And in May 2013—during the

time period covered by Plaintiffs' Request—the FBI developed training slides relating to this

topic. *See* FBI 776 (Charlton Decl., Ex. 22). It is thus implausible that between then and now the

FBI has not issued a single news media NSL request.

**B.      If the FBI relied on § 552(c) to exclude responsive records from its search, this was inappropriate.**

There is another possible explanation for the FBI's failure to identify records related to its

use of NSLs to target members of the news media: its reliance on one of FOIA's "exclusions,"

which allow agencies to refuse to acknowledge the existence of certain records. *See* 5 U.S.C.

§ 552(c). Through these exclusions, "Congress codified . . . the use of a *Glomar* response for the

following three limited categories of agency records: (1) law enforcement records described in

§ 552(b)(7)(A), which if disclosed could reasonably be expected to interfere with enforcement

proceedings; (2) informant records; and (3) certain classified records maintained by the FBI."

*Mobley v. CIA*, 924 F. Supp. 2d 24, 34 n.10 (D.D.C. 2013). If the FBI relied on one of these

provisions to exclude otherwise responsive records from its production, this would have been

improper for two reasons.

**1.      Section 552(c) does not apply to Category 1(e) of the Request.**

To the extent that the FBI relied on § 552(c) to refuse to acknowledge the existence of

responsive records, this was improper because Category 1(e) documents implicate none of the

three protected categories of information.

Under the first category, an agency may refuse to acknowledge the existence of certain

records if disclosure "could reasonably be expected to interfere with enforcement proceedings."

5 U.S.C. § 552(c)(1). But disclosing the existence of records here would acknowledge only that

the FBI had issued at least one request for approval to issue an NSL against a member of the news media. This would not reveal any proposed target or the nature of any investigation, and so would not interfere with enforcement proceedings.

Under the second category, the FBI may refuse to acknowledge the existence of informant records. 5 U.S.C. § 552(c)(2). Plaintiffs have not requested such records.

Finally, under the third category, the FBI may refuse to acknowledge the existence of records that "pertain[] to foreign intelligence or counterintelligence, or international terrorism," when "the existence of the records is classified." 5 U.S.C. § 552(c)(3). But even if *all* responsive records fell within those categories, which seems unlikely, the very existence of such records is not classified. An official acknowledged in 2018 that the FBI "does not *currently* use national security letters to advance media leak investigations"—that is, he disclosed the non-existence of that specific type of record for that time period. *See* Letter to Sen. Ron Wyden from Stephen E. Boyd, Assistant Attorney General (Charlton Decl., Ex. 23). Moreover, that the FBI may seek authorization to issue NSLs targeting members of the news media is no secret: it has acknowledged having rules governing the issuance of such NSLs; disclosed a portion of those rules; and released related training slides during this lawsuit. *See* Appendix G.12, 2011 DIOG, FBI 395–422, Ex. 15; FBI 776, Ex. 22. These substantial disclosures leave little doubt that the FBI has issued NSLs targeting members of the news media during the time period covered by the Request; in fact, DOJ has acknowledged the FBI's use of demand letters related to NSLs (so-called "exigent letters") to target journalists in the past. DOJ, Office of Inspector Gen., A Review of the FBI's Use of National Security Letters (Aug. 2014), at 177–78. At the very least, the disclosures undermine any claim that revealing that fact could cause "damage to national

security," as is necessary to classify that fact. *See* 5 U.S.C. § 552(b)(1); Exec. Order No. 13,526 § 1.1(4).

> **2.      If the FBI believes that the existence or nonexistence of records is a protected fact, it has improperly withheld that determination from Plaintiffs.**

Separately, if the FBI has relied on an exclusion to protect the fact of the existence or nonexistence of records, it has done so in a procedurally improper manner. The FBI incorrectly suggests that it need not acknowledge whether Plaintiffs' request seeks records that could potentially implicate an exclusion, nor engage with Plaintiffs' arguments on the public record. Gov't Br. 17. Instead, it proposes to address the issue through "an *in camera* declaration." Gov't Br. 17 n.5. This approach is inconsistent with Congress's intent in enacting the exclusions and also with FOIA's judicial review provision, which contemplates meaningful adversarial testing of agency responses to requests. *See* 5 U.S.C. § 552(a)(4)(B).

Congress added these exclusions as "a narrow and specific statutory authority for criminal law enforcement agencies to act on the principle that 'an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA provision'"—that is, to codify the availability of the "*Glomar*" response for certain law enforcement records. 132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) (statement of Rep. Kindness) (citing *Gardels v. CIA*, 689 F.2d 1100 (D.C. Cir. 1982); *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976)). Congress anticipated that "the Federal courts will review agency refusals to acknowledge or deny the existence of records under these provisions" through the process that "has already been well-established in the leading 'glomarization' case involving the CIA." *Id.*

Under this process, agencies notify a requester that the request seeks records whose existence or nonexistence is itself "exempt from disclosure under a FOIA exception." *Wilner v. NSA*, 592 F.3d 60, 70 (2d Cir. 2009). The agency typically submits a public affidavit supporting this determination, permitting adversarial testing of whether the *existence* of the records sought is a fact protected under FOIA. *See generally id.*; *Florez v. CIA*, 829 F.3d 178, 184–87 (2d Cir. 2016). Although at times an agency supplements its response with a classified affidavit, the Second Circuit has instructed that when reviewing a *Glomar* response "[t]he court should attempt to create as complete a public record as is possible." *Florez*, 829 F.3d at 187 (quoting *Wilner*, 592 F.3d at 68).

Rather than follow this procedure, the FBI appears to suggest that it need not issue a *Glomar* response if the request implicates an exclusion. *See* Gov't Br. 17. Instead, the FBI has simply stated that there are no responsive records, *see* Gov't Br. 16–17, leaving Plaintiffs in the dark about whether the agency believes the existence or nonexistence of Category 1(e) records is a protected fact.

The FBI appears to believe that disclosing whether it believes this is a protected fact would necessarily disclose the existence of records themselves. But the *Glomar* procedure was designed to address precisely this difficulty, and the solution it provides allows adversarial testing even when it comes to the existence of the nation's most closely guarded intelligence secrets. And although other courts have allowed the FBI to explain the applicability of this provision in secret, those courts failed to give effect to Congress's intent in enacting the exclusions and to FOIA's preference for meaningful adversarial testing. *See Labow v. DOJ*, 831 F.3d 523, 533–34 (D.C. Cir. 2016); *ACLU of N.J. v. FBI*, 733 F.3d 526, 534–35 (3d Cir. 2013); *ACLU of Mich. v. FBI*, 734 F.3d 460, 472 (6th Cir. 2013). With a secretive process, Plaintiffs

have no opportunity to challenge the FBI's rationale, which hampers the district court's ability to engage in effective *de novo* review. And if the district court cannot explain its reasoning in a public order, this in turn undermines appellate review. The Second Circuit has never sanctioned this approach and, in other *Glomar* cases, has admonished courts "to create as complete a public record as is possible." *Florez*, 829 F.3d at 187 (citation omitted).

This Court should thus reject the FBI's secretive approach and order the FBI to state whether it believes that the existence or nonexistence of records responsive to Category 1(e) is a protected fact under § 552(c), and if so, to file a public affidavit supporting this determination.

**IV.        The Court should review the withheld documents *in camera*.**

As explained above, DOJ-Crim's and the FBI's challenged withholdings were improper. The sweeping redactions also indicate that they have failed to "take reasonable steps necessary to segregate and release nonexempt information," as required by FOIA. 5 U.S.C. § 552(a)(8)(A)(ii)(II). This includes failing to segregate and release information that the FBI provided to another FOIA requestor. *Compare* DIOG § 18.6.6.3.3, FBI 387, Ex. 14 *with* § 18.6.6.3.3 from EPIC FOIA Production (Charlton Decl., Ex. 24 (disclosing "the authority to approve NSLs may be designated to an acting official (see below)")).

Plaintiffs thus respectfully request that the Court order the release of any improperly withheld information. At the very least, the Court should exercise its broad discretion to "examine the contents of such agency records in camera." 5 U.S.C. § 552(a)(4)(B). This review is especially appropriate where, as here, "agency affidavits are not sufficiently detailed to permit meaningful assessment of the exemption claims." *PHE, Inc. v. DOJ*, 983 F.2d 248, 252 (D.C. Cir. 1993).

**CONCLUSION**

Plaintiffs respectfully request that the Court deny the government's motion for summary judgment and order DOJ-Crim and the FBI to release improperly withheld information from the challenged records, or, in the alternative, to conduct an *in camera* review. Plaintiffs also ask the Court to order the FBI to conduct a new search for records responsive to Category 1(e) and to state publicly whether it believes that Category 1(e) seeks records whose existence or nonexistence is a protected fact under § 552(c), and if so, to file a public affidavit supporting this determination.

Dated: February 21, 2020                                     Respectfully submitted,

                                                                                 s/ *Anna Diakun*
                                                                                 Anna Diakun (AD-0327)
                                                                                 Leena Charlton (5622147)
                                                                                 Alex Abdo (AA-0527)
                                                                                 Knight First Amendment Institute
                                                                                   at Columbia University
                                                                                 475 Riverside Drive, Suite 302
                                                                                 New York, NY 10115
                                                                                 anna.diakun@knightcolumbia.org
                                                                                 (646) 745-8500

                                                                                 *Counsel for Plaintiffs*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2(D) of the Individual Practices of the Honorable John G. Koeltl, I hereby certify that this document complies with the word limit and formatting requirements set by the Court. In accordance with the Parties' Scheduling Order, ECF No. 43, this document contains 6,997 words.


Dated: April 17, 2020                                    s/ *Anna Diakun*
                                                         Anna Diakun