UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
––––––––––––––––––––––––––––

FREEDOM OF THE PRESS FOUNDATION and
KNIGHT FIRST AMENDMENT INSTITUTE AT
COLUMBIA UNIVERSITY,                              17-cv-9343 (JGK)

                         Plaintiffs,             OPINION AND ORDER

          - against -

DEPARTMENT OF JUSTICE, NATIONAL
SECURITY AGENCY, CENTRAL
INTELLIGENCE AGENCY, and OFFICE OF
THE DIRECTOR OF NATIONAL
INTELLIGENCE,

                         Defendants.
––––––––––––––––––––––––––––

JOHN G. KOELTL, District Judge:

     The plaintiffs, Freedom of the Press Foundation and the

Knight First Amendment Institute at Columbia University, brought

this action under the Freedom of Information Act ("FOIA"), 5

U.S.C. § 552, seeking documents from certain components of the

Department of Justice ("DOJ"), including the Criminal Division

("DOJ-CRIM") and the Federal Bureau of Investigation ("FBI"), as

well as the National Security Agency ("NSA"), the Central

Intelligence Agency ("CIA"), and the Office of the Director of

National Intelligence ("ODNI"). After the production of

substantial documents, the plaintiffs challenge only the

withholding of information on certain records by the DOJ-CRIM

and the FBI pursuant to FOIA Exemptions 1, 3, 5, and 7(E), the

sufficiency of the search conducted by the FBI for a category of

requested records, and the adequacy of the FBI efforts to segregate nonexempt portions of certain records from exempt portions.

The parties have cross-moved for summary judgment. For the reasons explained below, the plaintiffs are entitled to summary judgment with respect to two portions of records improperly withheld by DOJ-CRIM under Exemption 5, but not with respect to their remaining claims.[1] As such, both parties' motions for summary judgment are granted in part and denied in part.[2]

## I.

The following facts are undisputed unless otherwise noted. This case arises out of identical FOIA requests filed by the plaintiffs with each of the defendants, seeking records relating to restrictions imposed by statute, regulation, or the Constitution on government surveillance targeting members of the news media, or otherwise implicating the freedoms of speech, association, or press. Compl. ¶ 1. The DOJ has publicly adopted a policy document regarding constraints on the use of law enforcement and investigative authorities in relation to members of the news media, in its "Media Guidelines," codified in 28 C.F.R. § 50.10. The plaintiffs allege that their request is

---

[1] The plaintiffs do not challenge the search, review, or production of records by the CIA, NSA, or ODNI, and have not opposed the government's motion for summary judgment with respect to these defendant agencies.
[2] Concurrent with this Opinion and Order, the Court also issues an opinion ex parte and under seal that discusses am ex parte submission by the defendants.

motivated by certain undefined terms (including "member of the news media") in Section 50.10 and a lack of clarity regarding certain investigative tools, such as National Security Letters ("NSLs"), to which Section 50.10 may not apply. Compl. ¶¶ 2-3. NSLs, issued pursuant to 18 U.S.C. § 2709, permit the Director of the FBI, or certain designees, to compel third-party service providers to disclose certain information about their customers. Id. ¶ 3.

The Freedom of the Press Foundation is a non-profit organization based in California that "advocate[s] for government transparency and accountability by preserving the rights guaranteed to the press under the First Amendment and fortifying the public's right to know." Id. ¶ 12. The Knight First Amendment Institute is a New York not-for-profit organization, based at Columbia University, that "works to preserve and expand the freedoms to speech and the press." Id. ¶ 13.

The plaintiffs submitted their initial requests to the agencies on October 10, 2017. Id. ¶ 18, Ex. A. On November 29, 2017, the plaintiffs commenced the present action. Following negotiations between the parties, the plaintiffs agreed to narrow the scope of their request, and this Court approved a Final Processing List. Stipulation and Order Regarding Document Searches and Processing, Ex. A., ECF No. 26. The Final

3

Processing List clarified and defined certain terms, including
specifying that the term "Documents" was defined to encompass
only formal versions of the records at issue.  Of particular
relevance to the present motion is Category 1(e) of the Final
Processing List, which requested all records pertaining to "all
requests or statistical information concerning requests for
approvals to issue NSLs for the acquisition of records or
information of or about members of the new media, submitted to"
certain officials within the DOJ or the FBI, or pursuant to
section G.12 of Appendix G of the current FBI Domestic
Investigations and Operations Guide ("DIOG"). Id. (This request
was subsequently narrowed, because the plaintiffs have stated
they no longer seek any statistical data relating to NSLs. Pl's.
Br. 17 & n.9.)

On July 24, 2018, this Court approved a schedule for the
defendants to complete processing and production of nonexempt
responsive records. ECF No. 28.  DOJ-CRIM released 65 pages in
full and 4 pages in part, over 5 interim productions on October
1, October 31, November 30, and December 21, 2018, and February
22, 2019. Declaration of Gail Brodfuehrer, ECF No. 48
("Brodfuehrer Decl.") ¶¶ 9-10. The FBI released 506 pages in
full or in part over three interim productions on August 31,
September 28, and October 31, 2018. Declaration of Michael
Seidel, ECF No. 47 ("Seidel Decl.") ¶¶ 9-11. The FBI stated that

4

it "did not identify any records responsive to" Category 1(e).
Seidel Decl., Ex. G.  On November 6, 2019, the plaintiffs
provided the defendants with a list of withholdings and issues
they intended to challenge, Declaration of Stephen Cha-Kim, ECF
No. 45 ("Cha-Kim Decl."), Ex. A, and the DOJ-CRIM subsequently
released an additional two pages of records. Brodfuehrer
Decl. ¶ 14.

On January 22, 2020, the plaintiffs provided a final list
of withholdings that they seek to challenge, specifically
information withheld on 2 pages of DOJ-CRIM records under
Exemption 5 and 40 pages of FBI records under Exemption 1, 3,
and 7. The plaintiffs also challenge the adequacy of the FBI's
search with respect to records responsive to Category 1(e) of
the Final Processing List, and allege that the FBI failed to
segregate and produce properly responsive information.

## II.

The standard for granting summary judgment is well
established. "The Court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs.,

Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).[3] The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Where there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law. See Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am., 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012).

Courts frequently decide challenges to an agency's compliance with its FOIA obligations on a motion for summary judgment, and the factual basis for withholding records pursuant to FOIA Exemptions may be supported by declarations by agency personnel. See Carney v. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). "Affidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." Id. "[A]n agency's justification for invoking a FOIA exemption is

---

[3] Unless otherwise noted, all alterations, citations, footnotes, and internal quotation marks are omitted in quoted text.

sufficient if it appears logical or plausible." Wilner v. Nat'l
Sec. Agency, 592 F.3d 60, 73 (2d Cir. 2009). Thus, "[s]ummary
judgment is proper in a FOIA case where affidavits give
'reasonably detailed explanations why any withheld documents
fall within an exemption,' and show that the withheld
information logically falls within the claimed exemption.'"
Conti v. Dep't of Homeland Sec., No. 12-cv-5827, 2014 WL
1274517, *13 (S.D.N.Y. Mar. 24, 2014) (quoting Carney, 19 F.3d
at 812 and Halpern v. FBI, 181 F.3d 279, 291 (2d Cir. 1999)).

### III.

The cross-motions for summary judgment concern the
Government's compliance with its FOIA obligations. "A federal
agency responding to a FOIA request must (1) conduct an adequate
search using reasonable efforts, (2) provide the information
requested, unless it falls within a FOIA Exemption, and (3)
provide any information that can be reasonably segregated from
the exempt information." Gonzalez v. U.S. Citizenship & Immigr.
Servs., No. 19-CV-2911, 2020 WL 4343872, at *6 (S.D.N.Y. July
29, 2020). Although FOIA "adopts as its most basic premise a
policy strongly favoring public disclosure of information in the
possession of federal agencies," Halpern, 181 F.3d at 286,
"important interests [are] served by [FOIA's] exemptions." Food
Mktg. Inst. v. Argus Leader Media, 139 S.Ct. 2356, 2366, (2019)
(quoting FBI v. Abramson, 456 U.S. 615, 630-31 (1982)). Under

7

FOIA, an agency must disclose responsive agency records, unless information within such records may be "withheld pursuant to one of the nine enumerated [e]xemptions" found within Section 552(b). NRDC v. EPA, 954 F.3d 150, 159 (2d Cir. 2020) (quoting Dep't of Justice v. Tax Analysts, 492 U.S. 136, 150-51, (1989)). At issue in this case are four different exemptions: Exemptions 1, 3, 5, and 7(E). 5 U.S.C. § 552(b)(1), (3), (5), and 7(E).

The agency asserting a FOIA exemption, pursuant to Section 552(b), bears the burden of proof, and "all doubts as to the applicability of the exemption must be resolved in favor of disclosure." Wilner, 592 F.3d at 69; accord Carney, 19 F.3d at 812. Agencies often have provided reviewing courts with declarations by agency personnel, describing the factual basis for the agency's withholdings. See Vaughn v. Rosen, 484 F.2d 820, 826-27 (D.C. Cir. 1973). Such affidavits "are accorded a presumption of good faith," and are "sufficient to sustain the agency's burden," provided they include "reasonably detailed explanations." Carney, 19 F.3d at 812.[4]

---

[4] Further, as amended in 2016, FOIA requires that "[a]n agency shall—(i) withhold information under this section only if—(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b)." 5 U.S.C. § 552(a)(8)(A)(i). "An agency may not 'perfunctorily state that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information' among or between government officials." NRDC v. EPA, No. 17-CV-5928, 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019).

At issue on the cross-motions for summary judgment is 1) whether DOJ-Crim properly withheld one PowerPoint slide and a portion of a blank copy of an official form under FOIA Exemption 5; 2) whether the FBI conducted an adequate search for records responsive to Category 1(e) of the plaintiff's Final Processing List; 3) whether the FBI properly withheld certain documents under FOIA Exemptions 1, 3, and 7(E); and 4) whether the redacted passages on 40 pages of records, withheld by the FBI, were properly redacted because no non-exempt information was reasonably segregable from exempt information.

**A.**

The government has failed to sustain its burden for demonstrating that DOJ-CRIM properly withheld portions of a PowerPoint slide and an official form, pursuant to FOIA Exemption 5.  As such, the plaintiffs are entitled to summary judgment, requiring production of the records.

FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  Courts have understood Exemption 5 to "encompass traditional common-law privileges against disclosure, including the work-product doctrine, and executive, deliberative process and attorney-client privileges." Nat'l Council of La Raza v. Dep't of Justice, 411 F.3d 350, 356 (2d Cir. 2005).  At

9

issue here is whether the DOJ-CRIM correctly determined that the "deliberative process privilege" applied to two portions of responsive records: (1) a training slide and (2) instructions on an official form.

The deliberative process privilege seeks to "protect[] open and frank discussion" among agency decisionmakers, based "on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001).  An intra-agency document may properly be withheld pursuant to the deliberative process privilege if it is: "(1) predecisional, i.e., prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, i.e., actually . . . related to the process by which policies are formulated." ACLU v. Nat'l Sec. Agency, 925 F.3d 576, 592 (2d Cir. 2019) (quoting Nat'l Council of La Raza, 411 F.3d at 356). "A document is predecisional when it is prepared in order to assist an agency decisionmaker in arriving at his decision." Grand Cent. P'ship v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999). "Protected by this privilege are recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Tigue v. Dep't of Justice, 312 F.3d 70, 80 (2d Cir.

2002). However, "Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy," lest the exemption be allowed to "eviscerate FOIA's purpose of avoiding 'secret law.'" N.Y. Times Co. v. Dep't of Justice, 939 F.3d 479, 490 (2d Cir. 2019) (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 138, 153 (1975)).

The plaintiffs challenge the DOJ-CRIM's withholding of two portions of responsive records pursuant to Exemption 5: (1) a full slide from a February 2018 PowerPoint presentation, titled "News Media Policy" and (2) a portion of an official form, titled "News Media Policy Consultation," that appears to provide instructions to agency staff members on the necessary information required for a consultation with the Policy and Statutory Enforcement Unit regarding investigations involving members of the news media.  The government has failed to demonstrate that the withholding of the slide from the February 2018 PowerPoint presentation or portions of the News Media Policy Consultation instructions were appropriate under Exemption 5.

Through declarations, DOJ-CRIM has asserted that the PowerPoint slide contains "hypothetical scenarios requiring authorization pursuant to Section 50.10, and information relating to authorization decisions." Brodfuehrer Decl. ¶ 16.

11

By the DOJ-CRIM's own description, the PowerPoint presentation
contains "internal guidelines," intended to instruct staff
members on their obligations pursuant to Section 50.10 for
certain investigations and prosecutions that involve gathering
information from, or records of, or questioning, arresting, and
charging "members of the news media." Brodfuehrer Decl. ¶ 15.
Similarly, on the third slide of the unredacted, released News
Media Policy PowerPoint slides, staff members were instructed
that "[f]ailure to comply with [Section 50.10] may constitute
grounds for reprimand or other discipline." Declaration of Leena
Charlton, ECF. No. 52 ("Charlton Decl."), Ex. 1. Section 50.10
is a public document, that makes explicit reference to the need
for DOJ staff members to consult DOJ-CRIM under certain
circumstances. DOJ-CRIM does not contest that the slides are
final versions, nor that the slides were disseminated to DOJ
staff members to instruct them on how to comply with their
obligations under Section 50.10.  Nevertheless, the government
has argued that the slide at issue represents the "personal
opinions" of the slide's author, and that the slide reveal
"interim steps" of the agency's decision-making process.

Both arguments seek to stretch this Exemption too far.
While its earlier drafts may have merely reflected the personal
opinions of the slide's author, the final version cannot
reasonably be so limited.  It was communicated to staff members

12

with a warning that failure to follow its guidance could result in reprimand; as such, it cannot be construed as the subjective views of only an individual staff member.

Further, although the guidance in the slides may assist with future decision-making applying the policy to specific scenarios, the policy itself and management's expectations concerning its application have already been determined. Put simply, the training slide deck at issue "is not a step in making a decision; it is a way to disseminate a decision already made." Am. Immigr. Council v. Dep't of Homeland Sec., 905 F. Supp. 2d 206, 218 (D.D.C. 2012) (finding that PowerPoint slides prepared to train agency employees did not merit Exemption 5 because the slides were "prepared . . . to convey routine agency policies."). The fact that hypotheticals or stylized examples are used to instruct staff members about a policy does not transform such materials into a deliberative work product. Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980) (finding certain memoranda could not be withheld under Exemption 5, because they merely "discuss[ed] established policies and decisions [pursuant to] the agency regulations in the light of a specific, and often hypothetical, fact pattern").

Thus, the explanations and instructions provided by agency officials to staff members, with the apparent authority of senior management, regarding the implementation of the News

13

Media policy, cannot reasonably be understood to be either the personal views of an individual trainer, or interim steps for a decision not yet made. See Gen. Elec. Co. v. Johnson, No. 00-cv-2855, 2006 WL 2616187, at *6 (D.D.C. Sept. 12, 2006) (noting relevant considerations for Exemption 5). Instead, these slides—including the portion of the withheld hypotheticals slide—are the "effective law and policy" of the agency. N.Y. Times Co. v. Dep't of Justice, 939 F.3d at 490; Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. Dep't of Justice, 697 F.3d 184, 195 (2d Cir. 2012) ("[T]he document claimed to be exempt will be found outside Exemption 5 if it closely resembles that which FOIA affirmatively requires to be disclosed: 'final opinions . . . made in the adjudication of cases,' 'statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register,' and 'administrative staff manuals and instructions to staff that affect a member of the public.'") (quoting 5 U.S.C. § 552(a)(2)(A)-(C)).

Similarly, the News Media Policy Consultation form, of which the DOJ-CRIM has withheld a portion, is an "online form" to be "completed by DOJ attorneys consulting with the [DOJ-CRIM] pursuant to 28 C.F.R. § 50.10." Brodfuehrer Decl. ¶ 17. Section 50.10 makes clear that in at least two sets of circumstances, consultation with the DOJ-CRIM is a mandatory requirement for Department staff members. See 28 C.F.R.

14

§ 50.10(c)(3)(iii)(B), (c)(6). In its released, redacted form, the News Media Policy Consultation form instructs DOJ staff members to attach a "detailed memorandum" containing "facts of the investigation or prosecution," the staff member's "proposed course of action," and, if the consultation is related to "whether an individual or entity is a member of the news media," staff members are instructed to "provide relevant facts and analyze" certain factors.  Charlton Decl., Ex. 2. However, the DOJ-CRIM has redacted the factors, for which DOJ staff members must "provide relevant facts." Id.

   As with the withheld DOJ-CRIM slide, the government does not claim that the requested form is not a final version, that the form is only a proposal that was never put to use, or that the form was somehow not properly approved by senior management.[5] Nevertheless, the government has asserted that the redacted portion of the form, "falls into the category of 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" Def.'s Br. at 17, ECF. No. 46.  This assertion may be true for memoranda attached by attorneys with completed forms, or other records

---

[5]  The agency declaration calls the form a "template form" which DOJ attorneys must complete. Brodfuehrer Decl. ¶ 17.  The Final Processing List made clear that the plaintiffs were only seeking final versions of documents. Ex. A. to Stipulation and Order Regarding Document Searches and Processing, ECF No. 26 (defining "Documents" as only including "formal" version).

produced during the consultation, that might analyze the stated
required factors. See, e.g., Isiwele v. Dep't of Health & Human
Servs., 85 F. Supp. 3d 337, 357-58 (D.D.C. 2015) (affirming
agencies' decision to redact the "handwritten notes" of an
agency adjudicator from an immigration worksheet, because such
notes were predecisional and "reveal the adjudicators'
impressions and recommendations to a supervisor regarding agency
action"). But, the DOJ-CRIM's assertion of the deliberative
process privilege with respect to the form itself stretches the
exemption too far. The final, operative version of the News
Media Consultation form cannot reasonably be considered as "the
personal opinion[] of the writer"; it is a standardized form
document including instructions with which DOJ staff members are
expected to comply, in at least a certain set of circumstances.
While the way in which the information submitted by Department
staff members as part of Media Policy Consultations is weighed,
analyzed, and assessed might be protected under Exemption 5, the
information that the agency has already decided staff members
must submit, as part of the consultation process, is not. Cf.
Cause of Action Inst. v. Dep't of Justice, 330 F. Supp. 3d 336,
354 (D.D.C. 2018) ("Extending the privilege to encompass every
communication that relates in some way to an agency's
predecisional correspondence would fly in the face of the
general directive that the Act's exemptions be narrowly

16

construed."). The instructions represent a decision, based on legal interpretations and policy, regarding the scope of relevant information that is necessary for the consultation process. As such, like the redacted PowerPoint slide, these instructions are the very type of "effective law and policy" which courts have long understood to fall outside of Exemption 5. Brennan Ctr. v. Dep't of Justice, 697 F.3d at 195; 5 U.S.C. § 552(a)(2)(C)(agencies shall make available "instructions to staff that affect a member of the public").

The agency has asserted that release of the withheld portions of the News Media Slide or the News Media Policy Consultation form would "create a foreseeable harm" because it would "result in public confusion or erroneous information about interim steps in the Section 50.10 authorization process." Brodfuehrer Decl. ¶ 21.  But, the release of this information will only reveal what factors the DOJ-CRIM, as a matter of its existing policy, has already instructed its staff members are relevant to the decision of whether an individual is a member of the news media. Cf. Sears, Roebuck & Co., 421 U.S. at 151 (noting that "it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached"). As such, this information will alleviate public confusion regarding the Section 50.10 consultation process itself, especially

17

regarding the scope of relevant considerations for understanding the term, "member of the news media."

The government has similarly argued that disclosure of this form and training slide might "chill" frank, internal policymaker discussions. But, while disclosure of the memoranda produced based upon the instructions in individual cases might chill staff members' candor, the disclosure of the instructions themselves is unlikely to have any negative impact on the potential for open, frank discussions. Nor could a single slide of hypotheticals reveal such significant insight into how DOJ-CRIM officials would decide future, specific, concrete cases as to have a chilling effect on future discussions. As such, the government has failed to demonstrate persuasively how a few bullet points suggesting the application of the News Media Policy to a small number of stylized, hypothetical examples would affect candor.

Because the DOJ-CRIM chose to assert only Exemption 5, and failed to sustain its burden that withholding the information on the records at issue was appropriate on that basis, the plaintiffs are entitled to summary judgment that the withheld portions of the records should be produced.

### B.

The Government has demonstrated that the FBI's search in response to the plaintiff's FOIA request was adequate and

18

that the FBI used reasonable efforts to respond completely to
the plaintiffs' requests.[6]

The adequacy of an agency's search is "measured by the
reasonableness of the effort in light of the specific request."
Whitaker v. Dep't of Commerce, 970 F.3d 200, 206 (2d Cir. 2020).
To respond "adequately," an agency must show that "it made a
good faith effort to conduct a search for the requested records,
using methods which can be reasonably expected to produce the
information requested." Id. at 206-07 (quoting Oglesby v. Dep't
of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990)); see also Grand
Cent. P'ship, 166 F.3d at 489 (holding that FOIA requires an
agency to "demonstrate that the search was reasonably calculated
to discover the requested documents, not whether it actually
uncovered every document extant"). "This standard does not
demand perfection, and thus failure to return all responsive
documents is not necessarily inconsistent with reasonableness."
Adamowicz v. IRS, 552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008);
Amnesty Int'l USA v. CIA, No. 07-CV-5435, 2008 WL 2519908, at
*11 (S.D.N.Y. June 19, 2008)("FOIA does not demand a search that
would be futile"). The reasonableness of a search may be
"established solely on the basis of the Government's relatively
detailed, non-conclusory affidavits that are submitted in good

---

[6] The plaintiffs only challenge the adequacy of the FBI's search for records
responsive to Category 1(e) of the Final Processing List.  Pl.'s Br. at 4.

faith." Adamowicz, 552 F. Supp. 2d at 361.  A declaration in
support of the reasonableness of a search should explain "the
type of search performed, and aver[] that all files likely to
contain responsive materials . . . were searched." Iturralde v.
Comptroller of Currency, 315 F.3d 311, 313-14 (D.C. Cir. 2003).
However, such declaration "need not 'set forth with meticulous
documentation the details of an epic search.'" Gonzalez, 2020 WL
4343872, at *7 (quoting Perry v. Block, 684 F.2d 121, 127 (D.C.
Cir. 1982) (per curiam)).

In this case, the FBI's declarations from Michael Seidel
and David Hardy demonstrate that the FBI undertook a search
"reasonably expected to produce the information requested."
Whitaker, 970 F.3d at 207.  Michael Seidel is the Assistant
Section Chief of the Record/Information Dissemination Section
("RIDS"), Information Management Division ("IMD") of the FBI,
since June 2016, and before that date, he was the Unit Chief of
the RIDS Litigation Support Unit since November 2012. Seidel
Decl. ¶ 1. David Hardy is the Section Chief of RIDS, IMD, since
August 2002. Declaration of David Hardy, ECF No. 54 ("Hardy
Decl.") ¶ 1. The Seidel Declaration provided a detailed
description of the FBI's Central Record System, and explained
why a Central Records System index search was unlikely to
provide records responsive to the plaintiff's request. Seidel
Decl. ¶¶ 13-17. Similarly, through his initial and supplemental

declarations, Seidel explained that because "the FBI does not track the specific category of NSL requests sought by the plaintiffs," Seidel Decl. ¶ 19, the FBI reasonably chose to question an NSL subject matter expert in the FBI's Office of the General Counsel, National Security Cyber Law Branch ("NSCLB"), who was "the agency's designated point-of-contact regarding [NSL] matters." Seidel Supplemental Declaration, ECF No. 65 ("Seidel Supp. Decl.") ¶ 2; see also Seidel Decl. ¶ 19; Hardy Decl. ¶ 4. The subject matter expert was "unable to identify any responsive records." Seidel Decl. ¶ 19. Next, based on a "review of the search stipulation and [F]inal [P]rocessing [L]ist, the [subject matter expert] was able to identify the small, limited number of individuals within the agency who would know of the existence of responsive requests for NSLs." Seidel Supp. Decl. ¶ 2. Such potential custodians were "line-level employees specifically responsible for NSLs," and "would have access to any responsive requests for NSLs, should they exist." Id. These potential custodians were queried and were likewise "not aware of the existence" any responsive records. Id.; see also Seidel Decl. ¶ 19; Hardy Decl. ¶ 4.

Seidel also noted that the NSCLB office, as the "gatekeepers" for any reporting data concerning the use of NSLs, was identified as the "FBI office most likely to possess responsive materials." Seidel Decl. ¶ 20. The NSCLB "could

locate no records responsive to the request." Seidel Decl.
¶ 21. Seidel has represented to the Court in a supplemental
declaration, that "if records responsive to [the plaintiffs']
request existed, their existence would have been known to the
subject matter expert and/or the individual custodians
consulted, and those custodians also conducted searches of their
records based on their work history to confirm that no
responsive records exist." Seidel Supp. Decl. ¶ 4. Further, the
agency's declaration submitted by Hardy, specifically asserted
that "[a]ll potential custodians of records were queried and no
responsive records were found to exist." Hardy Decl. ¶ 4.

The plaintiffs offer several arguments about the inadequacy
of the search. Each is without merit. Primarily, the plaintiffs
offered several conclusory assertions that such records
responsive to Category 1(e) must exist, although their
assertions do not undermine the sufficiency of the FBI's search
or suggest bad faith from the agency declarants. The plaintiffs
suggest that the search was inadequate because the FBI's
declarations do not include the names of the specific custodians
that were searched and because the declarations from the FBI
officials regarding the search lack sufficient detail or are
"conclusory." Second, the plaintiffs assert that if the FBI
relied upon Section 552(c) to exclude responsive records, such
an exclusion was inappropriate because the FBI failed to supply

a "public affidavit supporting this determination." Pl.'s Br. at 20-24, ECF. No. 58.

First, "[m]ere speculation that as yet uncovered documents may exist" is not enough to undermine the sufficiency of the FBI's search, SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991), particularly for a narrow category of documents. See, e.g., Flores v. Dep't of Justice, 391 F. Supp. 3d 353, 362 (S.D.N.Y. 2019) (rejecting plaintiff's argument that "because the defendant did not produce records related to three particular speeches he alleges were given by U.S. Attorney Bharara, the defendant's search was not adequate"); Nat'l Inst. of Military Justice v. Dep't of Def., 404 F. Supp. 2d 325, 349 (D.D.C. 2005) (rejecting a challenge to the adequacy of a search based on nonproduction of documents referenced in produced documents where, as here, it was "clear that the defendant's search was reasonably designed to discover all responsive documents"), aff'd, 512 F.3d 677 (D.C. Cir. 2008).

Further, the plaintiffs have offered no authority which requires agencies to name each custodian searched, and the FBI provided a declaration with sufficiently detailed descriptions about how it approached the search and identified which staff members might have access to responsive records. Seidel Dec. ¶ 19; Hardy Decl. ¶ 4. See Brennan Ctr. For Justice at N.Y. Univ. Sch. Of Law v. Dep't of Homeland Sec., 331 F. Supp. 3d 74, 85-86

(S.D.N.Y. 2018) (affirming the adequacy of a search based on the FBI's descriptions about the chosen manner for conducting the search, the nature of the records, and the design of the FBI's internal databases and recordkeeping systems). The decision to provide declarations from the agency officials responsible for overseeing the agency's FOIA search process was similarly reasonable and appropriate. See, e.g., Cunningham v. Dep't of Justice, 40 F. Supp. 3d 71, 84 (D.D.C. 2014) ("An affiant who is in charge of coordinating an agency's document search efforts is the most appropriate person to provide a comprehensive affidavit in FOIA litigation."), aff'd, No. 14-5112, 2014 WL 5838164 (D.C. Cir. Oct. 21, 2014); Kay v. FCC, 976 F. Supp. 23, 34 n.29 (D.D.C. 1997) ("Generally, declarations accounting for searches of documents that contain hearsay are acceptable."), aff'd, 172 F.3d 919 (D.C. Cir. 1998).

The plaintiffs argue that, even after Seidel's supplemental declaration, it is unclear whether former employees' records were searched, and, if such records were not searched, the plaintiffs assert, the search was inadequate. Pl.'s Reply to Seidel Supp. Decl., ECF 66, at 2-3 (relying on certain language within Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency, 877 F. Supp. 2d 87, 101-102, 112 (S.D.N.Y. 2012)). First, the plaintiffs sought documents dating back to 2013, but both Seidel and Hardy have been in their positions for longer

than that and would have had knowledge of the appropriate

persons with knowledge of the relevant files. The plaintiffs

offer no reason to question the good faith assertions in the

declarations by Seidel and Hardy.[7]  See Nolen v. Dep't of

Justice, 146 F. Supp. 3d 89, 97 (D.D.C. 2015) ("[A] search is

generally adequate where the agency has sufficiently explained

its search process and why the specified record systems are not

reasonably likely to contain responsive records."); Nat'l Day

Laborer Org. Network, 877 F. Supp. 2d at 101 ("Because the

agencies are more familiar with their work than the plaintiffs

or the Court, they are entitled to some degree of deference

regarding their determination of search locations."). The steps

taken by the FBI were "reasonably expected to produce the

[records] requested," if such responsive records were within the

agency's possession. Whitaker, 970 F.3d at 207.

The plaintiffs have offered no evidence of bad faith, and

the Court therefore accepts that these searches were performed

---

[7] The plaintiffs' reliance on Nat'l Day Laborer Org. Network, a case involving "the largest FOIA search in the history of ICE and an enormous search for DHS and the FBI as well," seeking board categories of records, resulting in searches that involved "hundreds of employees and thousands of hours," 877 F. Supp. 2d at 94, 111, is misplaced. In the portion of the opinion to which the plaintiffs' cite, the Nat'l Day Laborer Org. Network court took issue with the FBI's decision not to search seven former employees files of the office from which the "vast majority of the potentially responsive records" were collected. Id. at 101-102.  But, as the Nat'l Day Laborer Org. Network court acknowledged, its opinion was "intensely fact-specific because it involve[d] such a massive search," and some agency searches at issue there were "woefully inadequate." Id. at 95. The scope of the search for potentially responsive records at issue here is both much narrower and more specific, and there is no evidence that any search was "woefully inadequate."

as described in the declarations and that the FBI's NSL subject matter expert accurately assessed the likely custodians for potentially responsive records. See Whitaker, 970 F.3d at 206 (affirming district court's determination that the agency did not violate FOIA by declining to conduct a search "based on sworn declarations from [agency] officials explaining why the agency would not have responsive records"); Brennan Ctr. v. Dep't of Homeland Sec., 331 F. Supp. 3d at 86 (in the absence of evidence of bad faith, accepting the FBI's searches were performed as described in the declarations and were conducted in good faith); Conti, 2014 WL 1274517, at *13-14 (noting that "searches are presumed to have been performed in good faith" and rejecting plaintiff's arguments "essentially ask[ing] the Court to presume bad faith on behalf of the employees performing the searches").

Second, the plaintiffs claim that the FBI response to the request for records responsive to Category 1(e) is inadequate, because the FBI has not explained whether it is relying on Section 552(c) as a basis for its response. Section 552(c) provides a limited exclusion from FOIA for certain highly sensitive records, including certain criminal law enforcement records, where there is reason to believe that the subject of the investigation or proceeding is unaware of its pendency and disclosure could reasonably interfere with enforcement

proceedings; informant records; and, FBI records pertaining to foreign intelligence or counterintelligence, or international terrorist, when the existence of the records is classified. 5 U.S.C. § 552(c)(1)-(3).

The plaintiffs misconstrue what would be required of the FBI, if it were to have relied upon Section 552(c) to exclude records from the search. Section 552(c) "permits agencies to treat . . . records as 'not subject to the requirements of the FOIA" and as excluded, when the request relates to records within the specific narrow statutory categories. Light v. Dep't of Justice, 968 F. Supp. 2d 11, 30 (D.D.C. 2013). The FBI has provided an ex parte declaration setting forth an explanation regarding whether the exclusion was relied upon. Nothing more is required. Upon review of the FBI's ex parte in camera declaration, the Court has concluded that the objections raised by the plaintiffs with respect to any potential invocation of Section 552(c) are unavailing. See Labow v. Dep't of Justice, 831 F.3d 523, 533-534 (D.C. Cir. 2016); ACLU of Mich. v. FBI, 734 F.3d 460, 470-72 (6th Cir. 2013)(collecting cases); ACLU of N.J. v. FBI, 733 F.3d 526, 535 (3d Cir. 2013); Mobley v. CIA, 924 F. Supp. 2d 24, 71-72 (D.D.C. 2013); Light, 968 F. Supp. 2d at 30.

Therefore, the Government has carried its burden of demonstrating that the FBI's search for records responsive to

Category 1(e) was adequate and reasonably calculated to respond to the plaintiffs' request.

### C.

The plaintiffs challenge the FBI's withholding, in full or in part, 40 pages of records pursuant to FOIA Exemptions 1, 3, and 7(E). In particular, the plaintiffs challenge the withholding of portions of PowerPoint slides relating to the First Amendment, Media Leaks, and Social Media tools, and portions of the FBI's Domestic Investigations Operations Guide ("DIOG") and Counterintelligence Division Policy Directive and Policy Guide ("CDPG") under Exemption 7(E).[8] In addition, the plaintiffs challenge the FBI's withholding of two documents—one titled "Best Practice for Media Policy" and one titled "National Security Letters"—pursuant to Exemptions 1, 3, and 7(E).

FOIA Exemption 1 protects from disclosure records that are "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1). In recognition of the "uniquely executive purview of national security," Wilner, 592 F.3d at 76, the government's burden to

---

[8] The plaintiffs have declined to challenge the FBI's reliance on Exemption 7(E) to withhold "sensitive file numbers," the names and roles related to "[s]pecialized FBI units or squads," or email addresses and non-public web addresses. Seidel Decl. ¶¶ 25, 51; Pl.'s Br. at 10 n. 3.

establish the appropriateness of an Exemption 1 withholding is
a "light one," requiring only "logical" arguments for
withholding be provided. ACLU v. Dep't of Def., 628 F.3d 612,
624 (D.C. Cir. 2011).

FOIA Exemption 3 authorizes agencies to withhold records
"specifically exempted from disclosure by statute" if that
statute either (1) "requires that the matters to be withheld
from the public in such a manner as to leave no discretion on
the issue," or (2) "establishes particular criteria for
withholding or refers to particular types of matters to be
withheld." 5 U.S.C. § 522(b)(3). The FBI has withheld
information on four pages (Bates page nos. 1052-54, 1067)
pursuant to Section 102A(i)(1) of the National Security Act of
1947, as amended, which mandates that the Director of National
Intelligence "shall protect intelligence sources and methods
from unauthorized disclosure." Seidel Decl. ¶¶ 39-42; 50 U.S.C.
§ 3024(i)(1).  The Supreme Court has established a two-pronged
approach to evaluate an agency's invocation of FOIA Exemption 3,
which first requires courts to consider whether the statute
identified by the agency is a withholding statute as
contemplated by Exemption 3, and, if so, whether the withheld
material satisfies the criteria of the exemption statute. CIA v.
Sims, 471 U.S. 159, 167 (1985); Wilner, 592 F.3d 60, 72 (2d Cir.
2009). Section 102A(i)(1) has been understood by courts to be a

withholding statute, as contemplated by Exemption 3. See, e.g., N.Y. Times Co. v. CIA, 965 F.3d 109, 115 (2d Cir. 2020) (finding that CIA met its burden, when invoking Exemption 3 relating to the CIA's obligations under Section 102A(i)(1)); Sack v. CIA, 53 F. Supp. 3d 154, 172 (D.D.C. 2014) (affirming the CIA's withholding of information, pursuant to Exemption 3 and Section 102A(i)(1)). As such, the only question is whether the FBI has sustained its burden of demonstrating the information withheld under Exemption 3 contains "intelligence sources and methods" which the FBI was required to protect from disclosure.

Finally, FOIA Exemption 7(E) exempts from disclosure "[r]ecords or information compiled for law enforcement purposes", but only to the extent" that their production "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

In order to invoke Exemption 7(E), the Government must make a "threshold showing 'that the materials be records or information compiled for law enforcement purposes.'" Brennan Ctr. v. Dep't of Homeland Sec., 331 F. Supp. 3d at 97 (quoting John Doe Agency v. John Doe Corp., 493 U.S. 146, 148 (1989)). "To show that particular documents qualify as 'records or

information compiled for law enforcement purposes,' an agency

must establish a rational nexus between the agency's activity in

compiling the documents and 'its law enforcement duties.'" Id.

(quoting Keys v. Dep't of Justice, 830 F.2d 337, 340 (D.C. Cir.

1987)). Courts have understood FOIA's use of "law enforcement"

to "entail[] more than just investigating and prosecuting

individuals after a violation of the law," and to include

"proactive steps designed to prevent criminal activity and

maintain security." Pub. Emp. for Envtl. Resp. v. U.S. Section,

Int'l Boundary & Water Comm'n, U.S.-Mexico, 740 F.3d 195, 203

(D.C. Cir. 2014).

   The Court of Appeals for the Second Circuit has interpreted

this exemption to cover two categories of information, one in

which disclosure would disclose "techniques and procedures," or

"how law enforcement officials go about investigating a crime,"

and the other in which disclosure would disclose "guidelines"

for law enforcement investigations, or how the agency allocates

resources in planning future policy or conduct. See Allard K.

Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.,

626 F.3d 678, 682 (2d Cir. 2010). Within this Circuit,

"[d]iscussion of law enforcement techniques and procedures is

categorically exempt from FOIA disclosure, 'without need for

demonstration of harm.'" Iraqi Refugee Assistance Project v.

Dep't of Homeland Sec., No. 12-cv-3461, 2017 WL 1155898, at *5

(S.D.N.Y. Mar. 27, 2017) (quoting Allard K. Lowenstein, 626 F.3d at 681).[9] But, even with respect to "guidelines," agencies need not demonstrate an "actual or certain" risk that the withheld information if released could lead to circumvention, only a "chance of reasonably expected risk." Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009) (interpreting the qualifying phrase "if such disclosure could reasonably be expected to risk circumvention of the law"). "Exemption 7(E) clearly protects information that would train potential violators to evade the law or instruct them how to break the law," as well as "information that could increase the risks that a law will be violated or that past violators will escape legal consequences." Id.  Therefore, "Exemption 7(E) sets a relatively low bar for the agency to justify withholding . . . only requir[ing] that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." Brennan Ctr. v. Dep't of Homeland Sec., 331 F. Supp. 3d at 98-99.

---

[9] Indeed, as the plaintiffs acknowledge, this Court is bound by the holding of the Court of Appeals for the Second Circuit that the "qualifying phrase ('if such disclosure could reasonably be expected to risk circumvention of the law') modifies only 'guidelines' and not 'techniques or procedures.'" Allard K. Lowenstein Int'l Human Rights Project, 626 F.3d at 681-82; Pl.'s Br. at 10 n.2.

1.

The FBI has met its burden of demonstrating how the
information withheld solely pursuant to Exemption 7(E) was both
sufficiently related to law enforcement techniques, processes,
or guidelines, such that the information was properly withheld.

First, the FBI withheld portions of eight PowerPoint slides
on First Amendment and Media Leaks, and the plaintiffs challenge
that decision. Charlton Decl. Exs. 3-8 (Bates page nos. 12, 34-
35, 40, 905, 909, 1033-34). The government has asserted that
such withheld portions contained information that would
"essentially reveal the FBI's 'playbook' or strategies utilized
in specific circumstances and provide criminals and terrorists
with information on the FBI's capabilities and vulnerabilities"
for detecting and combating certain acts. Seidel Decl. ¶ 52. The
plaintiffs argue that the slides "seem to contain First
Amendment doctrine or other legal limits" and as such only
contain "broad statements of law," improperly withheld under
Exemption 7(E). Pl.'s Br. at 10. To support this proposition,
the plaintiffs point to the titles of two slides, and cite to
Knight First Amendment Inst. at Columbia Univ. v. Dep't Homeland
Sec., 407 F. Supp. 3d 311, 332 (S.D.N.Y. 2019). However, the
titles of these slides do not preclude the FBI's assertion that
the slides contain information regarding more than "mere
descriptions of codified law and policy," Knight First Amend.

Inst., 407 F. Supp. 3d at 333, and include information regarding the capabilities, vulnerabilities, and limitations of the FBI's techniques and procedures for detecting, investigating, and combating crime. Seidel Decl. ¶ 52; Charlton Decl. Exs. 3-5, 8, and 12. Contrary to the plaintiffs' conjectures, such information is related to "how law enforcement officials go about investigating a crime." Allard K. Lowenstein Int'l Human Rights, 626 F.3d at 682. The documents at issue in Knight First Amend. Inst. were very different.  In Knight First Amend. Inst., the court found that the State Department improperly withheld, pursuant to Exemption 7(E), portions of three Foreign Affairs Manuals ("Manuals") that appeared to be based directly on the text of a statute.  The Knight First Amend. Inst., court noted that it was "not clear that the [Manuals] [were] 'compiled for law enforcement purposes'" and the agency conceded that the Manuals generally consisted of "policy." Knight First Amend. Inst., 407 F. Supp. 3d at 332-33.  The context here is markedly different.  Unlike the State Department's Manuals, the FBI's training slides were "compiled for law enforcement purposes," and the FBI has submitted a reasonably detailed declaration emphasizing that these slides discuss law enforcement techniques and procedures. Therefore, the plaintiffs have failed to provide sufficiently detailed, plausible evidence to rebut the presumption of good faith afforded to the FBI's declaration and

34

stated explanations, with respect to the First Amendment and
Media Leak training slides.

Second, the plaintiffs also challenge the FBI's withholding
of information from two additional training slides on social
media tools, solely pursuant to Exemption 7(E). Charlton Decl.
Exs. 11-12 (Bates page nos. 903, 914). The Seidel Declaration
explained that those slides were withheld because they included
"the identify of, and the capabilities and limitations
(including restrictions) related to the use of certain non-
public investigative tools and the techniques by which they are
utilized (including any results)," and that such "cyber
products" are presently used by "law enforcement to query
information and develop investigative leads from a variety of
source data." Seidel Decl. ¶ 53.  Seidel further explained
plausibly: "Disclosure of the capabilities and/or
vulnerabilities of the data that can be collected through the
use of these tools and in specific situations, could enable
criminals to employ countermeasures to avoid detection." Id. The
plaintiffs argue that the slides "appear to primarily refer to
social media surveillance," which "may not be withheld because
it is 'well known.'" Pl.'s Br. at 13.

While courts have understood that "Exemption 7(E) only
protects techniques and procedures 'not generally known to the
public.' Doherty v. Dep't of Justice, 775 F.2d 49, 52 n. 4 (2d

Cir. 1985), the plaintiffs seek to stretch this limitation too far. See, e.g., Maguire v. Mawn, No. 02-cv-2164, 2004 WL 1124673, at *3 (S.D.N.Y. May 19, 2004) ("Although the public may know that banks often employ bait money, the public does not know whether and how a specific bank employs bait money."); Barnard v. Dep't of Homeland Sec., 598 F. Supp. 2d 1, 23 (D.D.C. 2009)("All of the techniques described in the cases above—security clearance procedures, polygraph examinations, drug investigatory techniques—are known to the public to some extent[, yet] [t]here is no principle of which the Court is aware that requires an agency to release all details concerning these and similar techniques simply because some aspects of them are known to the public."); Blanton v. Dep't of Justice, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1999) (holding that although information regarding polygraphs is "generally available," the "specific methods employed by the FBI" were not). The general existence of social media surveillance capabilities may be "well known," without the specific means of such surveillance being public knowledge. The plaintiffs have failed to overcome the presumption of good faith afforded to the FBI's declaration.

    Third, the plaintiffs challenge the FBI's decision to withhold portions of two policy guides: the Domestic Investigations Operations Guide ("DIOG") and the Counterintelligence Division Policy Directive and Policy Guide

("CDPG").[10]  The plaintiffs argue that such withheld portions

"largely describe legal or administrative prerequisites to the

FBI's use of an investigative technique," and that the FBI's

explanations were too vague, seek to cover administrative

approval processes not reasonably understood to be "techniques

or procedures" within the meaning of Exemption 7(E), and

withheld "publicly known" information, including information

regarding NSLs. Pl.'s Br. at 15-16. The plaintiffs' arguments

fail to rebut the presumption of good faith afforded to the

FBI's declaration.

    As the government persuasively notes, the DIOG and CDPG

relate specifically to the FBI's "law enforcement and national

security 'playbooks.'" Seidel Decl. ¶ 54. See Muslim Advocates

v. Dep't of Justice, 833 F. Supp. 2d 92, 104-05 (D.D.C. 2011)

(affirming withholding of material in certain chapters of the

DIOG but requiring a supplemental affidavit regarding the

withholding of an additional chapter). Further, to the extent

that withheld information may relate to administrative approval

procedures or prerequisites, the FBI's declaration has logically

noted that such descriptions would "identify the procedures,

techniques, and strategies" employed by the agency, including

---

[10] Specifically, Bates page nos. 377-78, 383-84, 387-88, 394(Charlton Decl. Ex. 14); 395-422 (Charlton Decl. Ex. 15), 1016-120.  In their brief, the plaintiffs declined to continue to challenge the withholding of DIOS §§ 18.6.6.3.5 or 18.6.6.3.7.4 on Bates Numbers 388-89. Pl.'s Br. at 14 n. 6.

"sensitive unknown investigative techniques" and "uses of these specific techniques and strategies." Seidel Decl. ¶ 54.  It is reasonable to conclude that even a discussion of stages of administrative approvals would include discussion of both the techniques and strategies being approved, as well as their relative strengths and vulnerabilities. The FBI represented that certain sections of the guides contained information withheld because it related to certain, specific, non-public intelligence gathering techniques (e.g., Bates page nos. 1017 and 1020, pages from the CDPF) and "specialized FBI Sections, Units, Squads" (e.g., Bates page nos. 1016, 1018-1020, pages from CDPG) Seidel Decl. ¶¶ 54, 56.  Revealing the existence of such intelligence-gathering techniques or such squads, units, or roles would, Seidel notes, provide insights regarding the capabilities and level of focus the FBI applies to certain activities, which might assist criminals seeking to avoid such focus. Id.  In addition, just because certain details concerning techniques or approval standards might be publicly known or available, does not mean that FOIA requires the FBI to release "all details concerning [such techniques] and similar techniques." Barnard, 598 F. Supp. 2d at 23; ACLU v. Dep't of Justice, 681 F.3d 61, 71 (2d Cir. 2012).[11]

---

[11]  As an example, the plaintiffs claim the redactions to DIOG § 18.6.6.3.4 (Bates page nos. 387-88, titled "Standards for Issuing NSLs") were inappropriate because the plaintiffs claim such standards are "publicly

Moreover, even if the withheld portions are better understood as "guidelines," rather than "techniques or procedures," the Seidel Declaration provides sufficient support to demonstrate that disclosure of such information could reasonably be expected to jeopardize ongoing FBI investigations and operations and assist those seeking to violate or circumvent the law. Allard K. Lowenstein, 626 F.3d at 681; Mayer Brown LLP, 562 F.3d at 1193.  Indeed, courts frequently find that the kind of information regarding the vulnerabilities in agency techniques and procedures is properly withheld under Exemption 7(E), because of the potential to aid circumvention. See, e.g., Sack, 53 F. Supp. 3d at 174-75 (affirming CIA's withholding of training slides, guidance, policies, and procedures relating to polygraph testing, because, among other reasons, such

---

available" and that a "leaked version of the 2011 DIOG confirms that much of the information redacted from this section is publicly available through official sources." Pl.'s Br. at 16 n.8.

First, it would be inappropriate to rely on an outdated, leaked document in this case. As the plaintiffs do not claim the leaked version was "officially acknowledged," there remains at least "lingering doubts" as to the reliability of the information contained in the leaked version. N.Y. Times Co. v. CIA, 965 F.3d at 117-18 (noting that "anything less than the official disclosure . . . necessarily preserves some increment of doubt regarding the reliability of publicly available information," and that the CIA's "refusal to permit the elimination of that remaining doubt . . . protects valuable information"). Cf. Nishnic v. Dep't of Justice, 671 F. Supp. 776, 793 (D.D.C.1987) ("If any public leak or disclosure were sufficient to obliterate the protection afforded by Exemption 7(C), unauthorized disclosures would be encouraged and rewarded.").

In any event, the "leaked" passages the plaintiffs have provided make references to how FBI officials would go about investigating an individual, including descriptions of what kinds of facts might be sufficiently probative to warrant seeking NSLs for records regarding an individual or their contacts.  These passages would include law enforcement techniques and procedures.

information could reveal vulnerabilities in the methods used);
Mayer Brown LLP, 562 F.3d at 1193 (affirming IRS's withholding
of certain settlement guidelines pursuant to Exemption 7(E),
because such information "could encourage decisions to violate
the law or evade punishment").[12]

2.

The plaintiffs also challenge the withholding of
information on four pages of records (Bates page nos. 1052-54,
1067), within two documents (titled "Best Practices for Media
Policy" and National Security Letters") pursuant to a
combination of Exemptions 1, 3, and 7(E).[13]

With respect to the information withheld on these pages,
the FBI has provided a sufficiently detailed declaration
explaining the appropriateness of each of the Exemptions.

Regarding the application of Exemption 1, the Seidel
Declaration explained that the FBI withheld classified
information on pages 1052-53, and 1067 regarding detailed
intelligence activity information on specific individuals or
organizations of interest, properly classified at the "Secret"

---

[12]  The Government notes that portions of these guides were also withheld in
conjunction with FOIA Exemptions 1 and 3. Seidel Decl. ¶ 54, such as the
pages of the DIOG App. G.12, for which the plaintiffs challenge the
withholdings.  See Charlton Decl., Ex. 15.  There is no basis to question the
use of such  exceptions in connection with the redacted passages.
[13]  Specifically, the FBI withheld pages 1052-1053 and 1067 based upon
Exemptions 1, 3, and 7(E) concurrently, and 1054 on only Exemptions 3 and
7(E) concurrently.  Seidel Decl. ¶ 42.

level pursuant to E.O. 13,526 § 1.4(c). Seidel Decl. ¶ 35. With
respect to the withheld information on these three pages, Seidel
represented that disclosure of the information could reveal
actual intelligence activity or methods used by the FBI against
specific targets, intelligence-gathering capabilities, and
certain "criteria, triggers, limitations, requirements and
prerequisites that precede the use of the technique or method."
Id. Further, Seidel noted that pages 1052-53 also
involved classified information relating to foreign relations
or activities of the United States, such that it was
appropriately classified as "Secret" pursuant to E.O. 13,526
§ 1.4(d). Id. ¶ 36.

The Seidel Declaration also asserted that pages 1052-53 and
1067 were properly withheld under Exemptions 3, because the
pages contained detailed intelligence sources and methods,
within the meaning of the Section 102A(i)(1) of the National
Security Act. Id. ¶¶ 41-42. For page 1054, the FBI has asserted
that although it contains unclassified information (and thus, is
not eligible for Exemption 1), such information relates to
intelligence sources and methods, and descriptions of law
enforcement techniques, such that it is was properly withheld
pursuant to Exemptions 3 and 7(E). Id. ¶ 42.

Finally, the FBI also asserts that information was withheld
pursuant to Exemption 7(E) from pages 1052-53 and 1067 because

the information contained details about "investigative
methodology" and "strategy for specific type[s] of
investigations[s]." As noted above, Seidel describes how
disclosing the "FBI's analysis, including the levels of review
required in specific investigative situations" and "anticipated
obstacles and potential hurdles to investigation" could enable
criminals to "hamper or circumvent the FBI's investigative
techniques." Id. ¶ 52. Seidel further justified withholding
information from page 1054, because it contained "[s]ensitive
file numbers" as well as "internal secure e-mail and intranet
web addresses." Id. ¶ 25.

The plaintiffs allege that the FBI has withheld—at least in
part—"the very statutes, regulations, and guidelines" about
which the plaintiffs seek information. Pl.'s Repl. 16. But, the
plaintiffs offer no support for this allegation, beyond the
titles of the documents themselves.  Further, "even if the
redacted information seems innocuous in the context of what is
already known by the public," courts in this Circuit have
understood, that "[m]inor details of intelligence information
may reveal more information than their apparent insignificance
suggests because, much like a piece of jigsaw puzzle, each
detail may aid in piecing together other bits of information
even when the individual piece is not of obvious importance in
itself." ACLU v. Dep't of Justice, 681 F.3d at 71 (quoting

Wilner, 592 F.3d at 73). In short, the descriptions in the
Seidel Declaration provide a sufficient basis to conclude that
such withholdings were proper.

**D.**

Finally, the FBI has demonstrated sufficiently that it made
reasonable efforts to segregate exempt information from non-
exempt information and that the result of these efforts was that
the 40 pages in question were appropriately redacted.

FOIA requires that "[a]ny reasonably segregable portion of
a record shall be provided to any person requesting such record
after deletion of the portions which are exempt under this
subsection." 5 U.S.C. § 552(b). "Courts may rely on agency
affidavits to determine that documents withheld pursuant to a
valid exemption contain no reasonably segregable information."
Sack v. Dep't of Def., 823 F.3d 687, 695 (D.C. Cir. 2016)
(citing Armstrong v. Executive Office of the President, 97 F.3d
575, 578 (D.C.Cir.1996). However, the plaintiffs are not
entitled to disclosure if disclosure would produce only a "few
nuggets of non-intertwined, 'reasonably segregable'"
information. See Lead Indus. Ass'n, Inc. v. Occupational &
Health Safety Admin., 610 F.2d 70, 88 (2d Cir. 1970) (Friendly,
J.); see also ACLU v. Dep't of Justice, 252 F. Supp. 3d 217,
227-28 (S.D.N.Y. 2017) (collecting cases). The plaintiffs assert
that the FBI has failed to segregate properly nonexempt

information, especially public information or publicly known policies or standards. They urge the Court to require in camera review of the withheld documents.

While courts have discretion to require further in camera review, pursuant to 5 U.S.C § 552(a)(4)(B), "[w]hen the agency meets its burden by means of affidavits, in camera review is neither necessary nor appropriate," and is "particularly a last resort in 'national security' situations," such as this case. Larson v. Dep't of State, 565 F.3d 857, 870 (D.C. Cir. 2009).

The Seidel Declaration asserts that the agency undertook a careful review, in which each page was "individually examined", followed by a "secondary review" to confirm that withholdings were either "exempt itself or so intertwined with non-exempt information that segregation of the non-exempt information was not reasonably possible without revealing exempt information or leaving nothing but meaningless words or sentence fragments." Seidel Decl. ¶¶ 57-58. A review of the redacted documents that were produced shows the redaction process was done carefully, and line-by-line. This is consistent with the Seidel Declaration. Further, the FBI has released additional documents and clarified classification errors. See, e.g., Hardy Decl. ¶ 5, Ex. A; Seidel Decl. ¶ 26 n. 6. This "highlights the [FBI's] good faith in carrying out the plaintiff's request and points to the adequacy of the [FBI's] overall search both prior to and during

this litigation." Gonzalez, 2020 WL 4343872, at *9. As such, the plaintiffs have not provided a basis to defeat the presumption of good faith owed to the FBI's declarations on the issue of segregability. See ACLU v. Dep't of Justice, 252 F. Supp. 3d at 229.

## CONCLUSION

The Court has considered all the arguments of the parties. To the extent not specifically discussed, the arguments of the parties are either moot or without merit. The plaintiff's motion for summary judgment with respect to the DOJ-CRIM's disputed redactions of documents under Exemption 5 is **granted**, but **denied** in all other respects. The Government's motion for summary judgment is **denied** with respect to the DOJ-CRIM's disputed redactions under Exemption 5, but **granted** in all other respects. The Clerk is directed to enter judgment accordingly and to close all pending motions and to close this case.

**SO ORDERED.**

**Dated:**      **New York, New York**
          **October 9, 2020**

                                        John G. Koeltl
                            **United States District Judge**